UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WELLOGIX, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 3:08-cv-119 |
| | § | |
| ACCENTURE, LLP, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Pending before the Court is Accenture's Motion for Summary Judgment (Doc. No. 210),

Accenture's Motion to Exclude Wellogix's Proposed Expert Witness Kendyl Roman (Doc. No.

212), and Accenture's Motion to Dismiss (Doc. No. 206). Upon considering the Motions, all

responses thereto, and the applicable law, the Court finds that the Motion for Summary Judgment

must be granted in part and denied in part, the Motion to Exclude Wellogix's Proposed Expert

Witness Kendyl Roman must be denied, and the Motion to Dismiss must be granted.

## I.      BACKGROUND

### A. Wellogix's Software Offerings

Plaintiff Wellogix, Inc. ("Plaintiff" or "Wellogix") is a software company that, beginning in

1998, offered a variety of software solutions to assist companies to manage complex services. (Doc.

No. 210 Ex. 6.) "Complex services" refers to a broad category of a company's business needs.

Within the oil and gas industry, "complex services" can refer to services needed by an oil and gas

producer, but the specific nature and amount of which are hard to define fully until the service is

completed. (Philip Dep. 230:20-24.) The oil and gas industry is generally divided into the

exploration and production ("E&P") sector (sometimes referred to as the "upstream" sector) and the

refining and marketing ("R&M") sector (sometimes referred to as the "downstream" sector). (Kostial Dep. 30:22-31:17.) "Complex services" in the E&P sector can include tasks such as drilling and completion of oil and gas wells, which in turn requires completion of tasks like cementing and drilling mud. (Philip Dep. 231:5-13.) Wellogix's software solution included functionality called Dynamaps, which were a number of templates that addressed various tasks within the E&P sector, such as cementing, drilling fluids, mud logging, and perforating. (Doc. No. 210, Exs, 6, 9.) In addition, Wellogix offered a functionality called Electronic Field Ticket reconciliation ("eFT" or "eField-Ticket"), which provided a method by which an oil & gas producer could electronically exchange work order and field ticket documentation with a supplier. (Doc. No. 210, Exs. 6, 9; Chisholm 30(b)(6) Dep. 67:9-14.) Another Wellogix software offering was WorkFlow Navigator ("WFN"). (Doc. No. 210, Ex. 6; Chisholm 30(b)(6) Dep. 68:12.)

### B. Wellogix's Work with BP America, Inc. on the "eTrans" Project

In 2000, Wellogix's predecessor company approached BP America, Inc. ("BP") about its software offerings for complex services. (Arb. Tr. 156:22-25.) Wellogix conducted a "proof of concept" test of its software with BP to demonstrate the software's ability to procure goods and services electronically. (*Id.* 157:6-11, 165:21-25.) As part of this "proof of concept" test, Wellogix delivered its software to BP. (*Id.* 157:12-14.) Wellogix was largely successful in these demonstrative efforts. (*Id.*)

In 2004, Wellogix and BP began work on a project called "eTrans," which was an attempt to implement an "electronic procurement" or a "purchase to pay" process in which procurement of complex services occurred electronically instead of using paper invoices. (Barnes Dep. 11:14-18, 12:17-25; Arb. Tr. 177:2-3.) Wellogix and BP entered into a letter of intent in 2004 regarding the eTrans project, followed by a Master Software Licensing Agreement ("MSLA"). (Arb. Tr. 158:5-9.)

The MSLA was executed on April 28, 2004. (Doc. No. 210, Ex. 32.) The MSLA contained a strict confidentiality/non-disclosure provision wherein BP agreed not to disclose Wellogix's software or licensed material to any third party. (*Id.*) BP's eTrans project involved not only Wellogix, but also a number of other companies, such as SAIC, Obsidian, New Millennium, and IBM. (Barnes Dep. 12:13-16.)

The eTrans Project incorporated the products of Wellogix's "proof of concept" testing with BP, including eField-Ticket, electronic invoicing, and WorkFlow Navigator, and put them into the eTrans project. (Arb. Tr. 157:22-25.) The eTrans project did not, however, involve the use of Wellogix's Dynamaps or templates for complex services. (*Id.* 1103:21-22.) During the eTrans project, Wellogix provided its software to BP through an Internet portal. (*Id.* 1125:23-1126:2.) Wellogix stored its source and object code for WorkFlow Navigator, eField-Ticket, and Dynamps behind a firewall that BP never penetrated. (*Id.* 1126:6-11.)

BP implemented the eTrans project in two operations centers: Durango, Colorado and Farmington, New Mexico. (Barnes Dep. 13:10-11.) BP's Project Manager for the eTrans project considered the eTrans project to be successful. (*Id.* 13:13-18.) However, the eTrans project was ultimately terminated at the end of 2005 due to cost and internal integration issues. (Doc. No. 210, Ex. 15.)

### C. Wellogix's Relationship with Accenture and SAP

Accenture is a global consulting firm that assists its oil and gas company clients in various ways, including the implementation of third-party software. (Arb. Tr. 72:9-11.) Beginning in 2000, Wellogix and Accenture entered into six different agreements reflecting their desire to create a marketing alliance to target potential customers, to submit joint proposals for submission in response to companies' requests for proposals, to share confidential information with each other,

3

and to allow Accenture to license Wellogix's software. In another agreement, executed after Accenture received a contract to implement certain software at Marathon Oil Company, Accenture subcontracted with Wellogix for provision of Wellogix's software, customer service, and technical expertise during the implementation process. (Doc. No 222 Exs. 29-34.)

SAP America, Inc. and SAP A.G. (collectively, "SAP") are a global business accounting software company that offers a software solution called Supplier Relationship Management ("SRM"). (Arb. Tr. 71:23-25.) SRM allows companies to handle a large number of business processes, including accounting, human resource, financial planning and plant maintenance. (*Id.* 154:5-9.) From 2000 to 2005, SAP did not have electronic complex services functionality. (*Id.* 73:19-22.) SAP approached Wellogix to be its complex services partner and to fill the complex services solutions gap in SAP's then-current software. (*Id.* 78:4-18.) At one point, SAP's level of interest in Wellogix reached the level where SAP considered becoming an owner of Wellogix. (*Id.* 191:18-22.) SAP visited Wellogix's office to conduct due diligence regarding Wellogix's financial and technical background. (*Id.* 191:23-192:9.) SAP and Wellogix executed a NetWeaver Cooperation Agreement in March 2005. (Doc. No. 210 Ex. 30; Arb. Tr. I 189:21-25.) Under this agreement, Wellogix and SAP agreed to integrate Wellogix's complex services software into SAP's NetWeaver software platform.  (Doc. No. 210 Ex. 30.)

### D. Accenture's Relationship with SAP

In early 2004, Accenture and SAP began developing together a software application known as "xIEP." (Kostial Dep. 20:10-11, 34:2.) "xIEP" referred to an "integrated exploration and production" application that interfaced with SAP's software using SAP's NetWeaver software platform. (*Id.* 29:8-9, 30:3-11.) Accenture and SAP aimed xIEP at the E&P sector of the oil and gas industry. (*Id.* 30:21.) They developed two scenarios for xIEP: asset maintenance (i.e. maintaining an

oil producing well or platform) and managing the life cycle of the asset. (*Id.* 34:16-35:13.) The third scenario, which was never developed, would have involved complex services. (*Id.* 35:23-25.) If the third scenario had been developed, Accenture intended to include Wellogix's complex services software solution as an integrated part of xIEP. (*Id.* 133:16-19.)

Accenture and SAP ceased development of xIEP in mid-2006 because SAP's NetWeaver platform did not function. (*Id.* 34:5-11.) BP never used xIEP or participated in the development of it. (Arb. Tr. 1192:4-5.)

### E. BP's Global E&P P2P Project

In early 2004, while the eTrans project was underway, BP began developing a project called "Global E&P P2P." (Arb. Tr. 176:25, 182:11-13.) The Global E&P P2P project differed from eTrans in that eTrans focused on complex services while Global E&P P2P covered the entire supply chain of all goods and services for all business units. (*Id.* 177:2-5.)

In 2004, BP hired Accenture to be the lead integrator of the Global E&P P2P project, that is, to select the software company that would be the platform of BP's P2P project. (*Id.* I 93:19-25.) The three companies that were considered as providers of the software platform were SAP, Maximo and Ariba. (*Id.* 178:3-4.) Wellogix would not have been capable of providing a software platform for the entire P2P project, but believed that it would provide the complex services component for the P2P project. (*Id.* 177:14-15, 177:19-23.) SAP submitted its bid to provide the software platform for the Global E&P P2P project to BP in April 2005. (*Id.* 1117:16-17.) In May 2005, pursuant to their partnering relationship, Wellogix and SAP made a joint presentation to BP during the BP's selection process for a software platform. (*Id.* 186:21-25; 1118:4-7.) During the May 2005 presentation, Wellogix described its eField-Ticket software, supplier collaboration capability for complex services, and complex services templates. (*Id.* 1118-1123.)

In the latter part of 2005, Wellogix first heard about the possibility that it might not be included in the building of the complex services solution of the Global E&P P2P project. (*Id.* 199:13-15, 200:17-20.) Wellogix learned that Accenture and SAP were planning to develop the complex services solution themselves. (*Id.* 199:20-22.)

BP began implementing Global E&P P2P in September 2005. (*Id.* 200:17-18.) Ultimately, Wellogix was not on the transition team that transitioned from eTrans to P2P. (*Id.* 181:21-23; 183:6-8; 1129:7-9.) During the transition process, information from eTrans was uploaded onto a website called SharePoint. (*Id.* 1185:18-20.) The eTrans SharePoint site contained various types of flow diagrams, implementation information for deployment, and interface design specifications designed by the eTrans team. (*Id.* 402-403.) At least some computer language and source code from eTrans was also on the SharePoint site. (*Id.* 406:21-407:3, 418:5-6.) BP allowed certain Accenture and SAP employees to access the SharePoint site, where BP knew many documents related to the eTrans project were stored, for the purpose of extracting lessons learned. (*Id.* 1341:15-1342:11.)

The Global E&P P2P Project ended in approximately October 2007, as BP began developing the E&P Backbone project to handle purchase to pay in its E&P sector going forward. (*Id.* 1190:16-17.)

### F. BP's Backbone Project

In March 2008, BP implemented the Backbone project. (*Id.* 1190:22.) BP was assisted in the Backbone project by KPMG. (Mahmood Dep. 25:4-10.) KPMG designed the architecture for Backbone, but did not use any portion of BP's E&P P2P project in developing Backbone. (*Id.* 29:10-24, 30:1-5.)

### G. Wellogix Files Suit Against BP, Accenture, and SAP

Wellogix filed suit against BP, Accenture and SAP in 2008. SAP was dismissed from the case due to improper venue. (Doc. No. 54.) Pursuant to a stipulation by the parties, Wellogix's action against BP was severed from the case against Accenture. (Doc. Nos. 106, 107.) Wellogix and BP agreed to arbitrate the claims between them, with Judge Keith P. Ellison acting as sole arbitrator. (Doc. No. 109.) Wellogix and Accenture agreed to proceed with a civil action in this Court. Wellogix's claims for relief against Accenture are: (1) breach of fiduciary duty; (2) aiding and abetting breach of fiduciary duty; (3) tortious interference with existing contracts; (4) tortious interference with prospective business relations; (5) misappropriation of trade secrets; (6) theft; (7) breach of confidence and trust; and (8) conspiracy to commit the alleged torts. (Doc. Nos. 110, 126, 205.)

### H. Wellogix-BP Arbitration

From June 22, 2010 through July 2, 2010, the private arbitration between Wellogix and BP was held. The arbitrator's findings of fact and conclusions of law were issued in August 2010 (the "Arbitration Order"). Key among the Arbitration Order's findings of fact were the following items: (1) BP's eTrans project SharePoint site contained various types of information designed by the eTrans team; (2) At least some computer language and source code from eTrans was on the SharePoint site; (3) BP allowed certain Accenture and SAP employees access to the eTrans site; (4) eTrans, Global E&P P2P, and Backbone have similar or identical elements in terms of architecture and process flow, at the more general levels; (5) no expert could conclusively state that Wellogix source or object code was being used in BP's P2P or Backbone programs; and (6) at some point during 2000 to 2006, Accenture and SAP did develop complex services templates. (Arb. Order ¶¶ 40, 41, 42, 46, 47, 53.)

With respect to conclusions of law, the Arbitration Order concluded that BP had committed a breach of contract by disclosing Wellogix's confidential information on the SharePoint site, to which Accenture and SAP had access, in violation of the MSLA. With respect to the misappropriation of trade secrets claim, the Arbitrator Order held that the evidence did not demonstrate that BP used or was using trade secrets belonging exclusively to Wellogix. The evidence failed to demonstrate that the process flow maps and architectural documents developed during the eTrans project were the trade secrets of Wellogix. Wellogix's source and object code, in contrast, was kept substantially secret and constituted a trade secret. However, no expert could conclusively testify as to whether Wellogix's source and object code could be found in SAP SRM 4.0 or 5.0. Though it appeared that SAP offered complex service functionality rivaling Wellogix's functionality in SAP SRM 7.0, it was undisputed that SAP SRM 7.0 was not used by BP.

## II.  PRECLUSIVE EFFECT OF ARBITRATION

Accenture contends that the findings contained in the Arbitration Order are binding on Wellogix in this civil action under the doctrine of issue preclusion. Wellogix argues that issue preclusion is not applicable because the issues being litigation in the present action are not identical to the issues addressed in the prior arbitration.

Under the doctrine of collateral estoppel, or issue preclusion, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude litigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). Collateral estoppel can be used defensively—a plaintiff may be estopped from asserting a claim that the plaintiff has previously litigated and lost against another defendant—or can be used offensively—a plaintiff seeks to estop a defendant from relitigating issues that the defendant previously litigated and lost against another plaintiff. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322,

328 (1979). "Collateral estoppel applies when, in the initial litigation, (1) the issue at stake in the pending litigation is the same, (2) the issue was actually litigated, and (3) the determination of the issue in the initial litigation was a necessary part of the judgment." *Harvey Specialty & Supply, Inc. v. Anson Flowline Equip. Inc.*, 434 F.3d 320, 323 (5th Cir. 2005).

This is a case of defensive non-mutual collateral estoppel. Accenture argues that Wellogix raised trade secret misappropriation and theft claims against BP in the arbitration that are virtually identical to the claims raised against Accenture in this action. Because Wellogix lost its claims in the arbitration, Accenture contends that the arbitration's findings against Wellogix have preclusive effect in the present action. Wellogix argues that there is not complete identity of issues between the claims addressed in the arbitration and the claims presented here and that additional evidence gathered during discovery after the arbitration substantiates Wellogix's claims against Accenture.

Wellogix asserted the following claims against BP during the arbitration: (1) breach of contract; (2) misappropriation of trade secrets; (3) theft; and (4) tortious interference with an existing contract. Wellogix's currently asserts the following claims against Accenture: (1) misappropriation of trade secrets; (2) theft; (3) breach of fiduciary duty; (4) aiding and abetting breach of fiduciary duty; (5) tortious interference with exssting contracts; (6) breach of confidence and trust; and (7) conspiracy.[1] As an initial matter, we note that Wellogix's claims against Accenture of breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of confidence and trust, and conspiracy were not raised vis-à-vis BP during the arbitration. Therefore, any issues of law relating to these four claims and that are presented in the current proceeding will not be precluded by findings made in the arbitration. As to issues of fact that arose during the arbitration and that are relevant to these four claims, the Court will have to address each issue of

---

[1] Wellogix states that it will no longer pursue its claim of tortious interference with prospective business relations. (Doc. No. 222 at 3 n.1.) Therefore, we will not analyze whether this claim is precluded by the findings made during the arbitration.

fact as it arises in the motion for summary judgment and at trial, apply the elements of collateral estoppel, and determine whether the particular issue of fact must be accorded preclusive effect.

With respect to Wellogix's claim of misappropriation of trade secrets, Wellogix was required to prove in the arbitration that: (1) it possessed a trade secret; (2) that BP used or disclosed the trade secret after either improperly obtaining it or obtaining via a breach of a confidential relationship; and (3) that Wellogix was injured by the use or disclosure. The Arbitration Order held that there was no trade secret misappropriation because there was no evidence that BP used Wellogix's trade secrets in its Global E&P P2P project. The issue presented in the arbitration, which was whether BP used Wellogix's trade secrets, is not identical to the one presented here, which is whether Accenture used Wellogix's trade secrets. Evidence of BP's use could be found only in BP's Global E&P P2P and Backbone projects, while evidence of Accenture's use could be found in Accenture's internal documents, the xIEP application, and, to the extent that Accenture's unlawfully disclosed Wellogix's trade secrets to SAP, in SAP's software. The Arbitration Order did not focus on Accenture's use or disclosure apart from the Global E&P P2P project. Thus, we do not accord preclusive effect in this action to the Arbitration Order's finding that BP did not use Wellogix's trade secrets insofar as this holding is used to absolve Accenture of liability for trade secret misappropriation.

However, with respect to the issue of whether a trade secret exists, we do give preclusive effect to our finding that Wellogix's trade secrets do not consist of the "architecture and process flow of the eTrans project." (Arb. Order at 9.) We reached this finding because it appeared "that several companies took part in developing these maps." (*Id.*) To the extent that Wellogix claims in this action that the architecture and the process flow documents of the eTrans project constitute a trade secret, this issue was at stake in the arbitration, was actually litigated during the arbitration,

and was necessary to the holding that there was no evidence of trade secret misappropriation. Further, Wellogix has had a full and fair opportunity to litigate this issue. As discussed in more detail in the Court's Memorandum and Order on Wellogix's Motion to Compel (Doc. No. 231), Wellogix had an opportunity to raise any concerns it had with BP's production of electronic data and did not timely do so. Wellogix cannot now rely on the possibility that it may not have received all of BP's electronic data to argue that it did not have a full and fair possibility to litigate the issue, especially when its expert testified without issue at the arbitration about BP's purported misappropriation of Wellogix's trade secrets. Finally, even if Wellogix was unable to decipher all of BP's electronic data, it is unclear how additional information would have changed the Arbitration Order's finding that the contribution of several companies to the architecture and process flow charts prevented these items from being Wellogix's trade secrets.

Wellogix also contends that it claims ownership over the "core process flow" documentation that it prepared and provided to Accenture in June 2005 regarding the way in which Wellogix Workflow Navigator and eField-Ticket could be integrated with SAP's software. (Doc. No. 222 at 5 n.2; Doc. No. 222 Ex. 22.) It is unclear whether this document was presented as evidence during the arbitration. Even if it was presented, this document does not appear to be part of the "architecture and process flow [documents] of the eTrans project," which we have held are not Wellogix's trade secrets. Rather, this document was sent by Wellogix to Accenture (which did not work on the eTrans project) in June 2005, when Accenture was heavily involved in BP's Global E&P P2P project. Moreover, this document does not appear to be the product of several companies' collaboration, but appears to have been produced only by a Wellogix employee. We cannot conclude that the Arbitration Order prevents Wellogix from arguing that the June 2005 "core process flow" documentation is a Wellogix trade secret.

With respect to Wellogix's claim of theft of trade secrets, the Arbitration Order's finding that BP did not engage in theft will not be given preclusive effect insofar as it is used to claim that Accenture did not engage in theft of trade secrets. Wellogix's theft of trade secrets claim is based on the same evidence as its trade secret misappropriation claim. Therefore, we reach this conclusion for the same reasons we do not accord preclusive effect to the Arbitration Order's finding regarding BP's misappropriation of trade secrets. As for Wellogix's theft of property and theft of services claims against Accenture, we need not rule on whether they are precluded by the Arbitration Order because we grant summary judgment to Accenture on these claims for reasons independent from the arbitration's findings.

With respect to Wellogix's claim of tortious interference with existing contracts, the claim presented in the current litigation is not identical to the claim presented in the arbitration. The arbitration focused on whether BP—through one of its employees—tortiously interfered with its own contracts with Wellogix. Here, however, we are asked to focus on whether Accenture—through its employees—tortiously interfered with Wellogix's contracts with BP and SAP. The factual and legal questions to resolve are quite different from those in the arbitration. Therefore, we will not give preclusive effect to the Arbitration Order's finding that BP did not commit tortious interference with an existing contract insofar as this finding is used to argue that Accenture did not commit tortious interference with an existing contract.

## III.   MOTION TO EXCLUDE KENDYL ROMAN AS EXPERT WITNESS

Accenture has moved to exclude Wellogix's expert witness Kendyl Roman ("Roman") on a number of grounds, including his qualifications and the reliability of his expert opinions.

### A. Legal Standard

Federal Rule of Evidence 702 provides for the admission of expert testimony that assists the trier of fact to understand the evidence or to determine a fact in issue. A court is charged with a "gatekeeping function" to ensure expert testimony is both reliable and relevant. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). Reliability is analyzed under Rule 702, which requires that: (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702. Experts are permitted to render opinions even if based on inadmissible evidence so long as the inadmissible evidence is of the type reasonably relied upon by experts in that field. *See* Fed. R. Evid. 703; *Daubert*, 509 U.S. at 595. Inadmissible facts or data that serve as a basis for the expert's opinion may not be disclosed to the jury by the proponent of the expert testimony unless a court determines "that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect." Fed. R. Evid. 703.

Further, the expert witness must be qualified "by knowledge, skill, experience, training, or education . . . ." Fed. R. Evid. 702. A court must exclude an expert witness "if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999); However, "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (citing *Daubert*, 509 U.S. at 596).

The party seeking to rely on expert testimony bears the burden of establishing, by a preponderance of the evidence, that all requirements have been met. *Daubert*, 509 U.S. at 593, n.10; *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

### B. Analysis

#### 1.     Experience in Oil and Gas Industry

Accenture first challenges Roman's qualifications on the basis that he does not have experience in the oil and gas industry, and specifically, in the electronic procurement of complex services. As a result, Accenture argues, Roman is not qualified to testify that Wellogix's purported trade secrets were somehow unique or otherwise qualify as a trade secret because he does not know whether these functionalities were achievable with existing software on the market. Wellogix responds that Roman is qualified to render an opinion.

The opinions proffered in Roman's second expert report fall within one of two categories: (1) those that discuss how Wellogix's software constitutes trade secrets; and (2) those that compare Wellogix's source code and software to BP's P2P and Backbone software and to SAP's software. As to the first category of opinions, Roman mainly discusses the various characteristics and functions of Wellogix's software that he claims should qualify as trade secrets. He does not offer opinions about the state of the relevant field in the early 2000s, nor whether other companies offered similar functions in their software. As such, Roman does not attempt to testify broadly about a field—i.e., oil and gas, or procurement within the oil and gas sector—in which he has little to no experience. Rather, Roman draws upon his experience in the software development field to explain to a layperson how various components and characteristics of Wellogix's software function and why certain components and aspects might be considered a trade secret.

Regarding the second category of opinions, Roman is qualified through his years of experience as a software developer and forensic analyst to compare, analyze, and opine on the resulting matches between Wellogix source code and software, on one hand, to BP's and SAP's software and source code, on the other.

14

The cases cited by Accenture, while relevant, are not persuasive. In *Taylor Pipeline Co., Inc. v. Directional Rd. Boring, Inc.*, 438 F. Supp. 2d 696 (E.D. Tex. 2006), the court held that a proposed expert with over 30 years of experience in the construction industry as a contractor could testify regarding the quality of construction methods, but could not testify regarding construction law topics, such as the obligations of parties to construction contracts. In *Kozak v. Medtronic, Inc.*, 512 F. Supp. 2d 913, 918-19 (S.D. Tex. 2007), the court held that an orthopedic surgeon with extensive training in biomedical engineering, experience designing spinal implant products, and a history of providing advice regarding the market for such products was unqualified to offer a future damages model. The court noted that, though the expert had experience generally in marketing spinal products, he did not have any experience calculating future damages or royalties based on projected future sales and market adoption/penetration rates. The connecting line between these cases is that an expert, who admittedly had years of experience performing a specific type of activity, was being asked in the case at issue to perform an admittedly new type of activity (i.e. constructing a damages model) or testify about a new area of knowledge (i.e. construction law). Here, however, Roman is providing an opinion based on a forensic analysis and comparison of software—an activity that he has performed several times in the past as an expert. In addition, he is parsing Wellogix's software into understandable terms for a layperson, an activity that he is able and qualified to do considering to his history working with various software programs. We deny Accenture's motion to exclude Roman's expert testimony on these grounds.

### 2. Experience with SAP Software

Accenture next argues that Roman is unqualified to render opinions regarding SAP software because he has no experience with SAP software directly and no experience with ABAP, the programming language used to write SAP source code. Wellogix responds that Roman has

sufficient experience with SAP software and that his opinion is based upon sufficient information and analytical tools.

SAP uses its own programming language, ABAP, to write its software. Roman testified in his deposition that he taught himself how to read and write ABAP source code, but has not taken an instructor-led course in ABAP. (Roman Dep. 141:15-143:24.) However, Roman also testified that he compared Wellogix and SAP source code by using a software program that compares the source code and generates any literal and non-literal matches between the source codes. (Roman Dep. 87:23-88:7; 231:4-232:12.) The comparison software can process the programming languages at issue here. (Roman Dep. 236:10-17; 238:12-23; 239:17-240:7.) Roman was required to review the matches generated by the source code and to analyze them to determine whether they indicated copying. (Roman Dep. 243:7-244:12.) Roman's ability to analyze the matches admittedly requires knowledge of ABAP, but, more importantly, requires an ability to compare two different programming languages with each other and determine whether matches in the source code are significant. Roman possesses this latter experience and, from our reading of his deposition, possesses enough of the former to conduct the necessary comparison. Accenture's real issues with Roman's expert report relate to his conclusions, rather than his level of experience with ABAP, and should be addressed through cross-examination. *See MGE UPS Sys. v. Fakouri Elec. Eng'g, Inc.*, 2006 U.S. Dist. LEXIS 14142, *11-*12 (N.D. Tex. Mar. 14, 2006) (experts in computer software need not be experts in electrical engineering in order to testify about software purportedly developed through electrical engineering principles).

The cases cited by Accenture do not persuade us that exclusion of Roman's expert testimony is necessary due to his purported unfamiliarity with ABAP. The Fifth Circuit upheld the exclusion of testimony in a bankruptcy case where a party proffered as an expert the president and owner of a

seafood supply company in order to establish the ordinary course of business in the baked goods industry. *In re SGSM Acquisition Co., LLC*, 439 F.3d 233, 240-41 (5th Cir. 2006). The Fifth Circuit noted that "it is certainly conceivable that a fellow businessman and DSD supplier like Stephens could have provided relevant testimony for Leidenheimer despite his lack of personal involvement in the baked goods industry." *Id.* at 241. However, the expert conceded that he did not have the necessary knowledge regarding normal terms of credit for baked goods vendors. This case does not require us to exclude Roman, and, in fact, suggests that Roman can testify in matters relating to ABAP as long as his testimony is supported by sufficient information. In another Fifth Circuit case, the court upheld the exclusion of a mechanical engineer who attempted to testify regarding failures in an automobile seat belt restraint system despite never having any academic or professional experience in automobile design, manufacture, air bags, or restraint systems. *Lofton v. Gen. Motors Corp.*, 33 F.3d 1379, No. 93-5590, 1994 WL 487251, at *3 (5th Cir. Aug. 19, 1994). Here, Roman has broad experience at the general level of computer design and programming in various programming languages and computer systems, and has developed experience with ABAP specifically. We decline to exclude Roman's expert opinion on these grounds.

### 3.    Reliability of Opinions

Accenture contends that Roman's methodology is unreliable because he is unable to testify regarding how his proprietary software matching tool worked and is unable to identify the standard tool used in the software analysis.

Roman testified that, in conducting the forensic review and analysis of source code, he used (1) a proprietary software tool; and (2) a standard took for indexing the source code. (Roman Dep. 87:25-88:7.) With respect to the proprietary tool, Roman testified that this was available on his company's website. (Roman Dep. 233:13-14.) Contrary to Accenture's argument, Roman described

in his deposition how his proprietary tool worked. He testified that the proprietary software tool included a number of tools within it, including a side-by-side comparison tool (that is the subject of and explained in one of Roman's patents) and a tokenizer that parses the source code to identify meaningful tokens. (*Id.* 232:15-233:9.) He described how he and his colleagues had come up with the list of files to input into the tools, and how the tool generated percentages associated with the matches between the source code. (Roman Dep. 236:10-240:7.) Roman did not misrepresent that the proprietary tool would automatically identify identical code, but clearly stated that identification of "functionally identical" code (as opposed to literally identical code) was a "manual process." (Roman Dep. 237:25.) Roman never offered an opinion in his report or his testimony that there was 98.7% identity between Wellogix's source code and SAP's source code; rather, this was an assertion made by Wellogix's counsel in their responsive briefing. Ultimately, Accenture's arguments are that Roman's conclusions are unreliable because they contradict Accenture's expert's conclusions, which is an insufficient basis for excluding expert testimony. *See Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 588-89 (7th Cir. 2000). Based on Roman's qualifications and his explanations of his methodology, we are satisfied that his opinions are sufficiently reliable and that he applied the principles and methods reliably.

With respect to the standard tool, Roman testified that one of his employees would know the name of the tool. (Roman Dep. 88:8-14.) During the Court's hearing regarding this motion on March 31, 2011, Wellogix's counsel represented that Roman would provide Wellogix with the name of the standard tool. Unless Wellogix has failed to turn over the name of the standard tool to Accenture, we decline to exclude Roman's testimony on these grounds.

### 4. Evidentiary Basis for Roman's Opinions

Accenture argues that there is no evidentiary basis for Roman's opinions regarding misappropriation because he cannot identify any Accenture employee who had access to Wellogix's source code or any evidence that Accenture provided input into SAP's source code. In fact, Roman's Second Expert Report cites several documents that provide a basis for his assertions that Accenture employees had access to Wellogix's intellectual property via a SharePoint site and through direct communications from Wellogix to Accenture. (Roman Second Expert Report ¶¶ 276-281, 298, 313.) His expert report also cites to documents written by Accenture employees indicating that they were involved in SAP's software development efforts in Germany and transferred information to SAP. (*Id.* ¶ 274.) If Accenture believes that reliance upon these documents is misplaced, it may highlight the issues during cross-examination. We deny Accenture's motion to exclude Roman's opinion on these grounds.

### 5. Roman's Analysis of SRM and ECC Software

The final basis on which Accenture moves to exclude Roman's testimony is his purported failure to analyze the software that is actually at issue in this case. Accenture contends that Roman did not analyze SAP's SRM software, which the key software at issue, and instead analyzed SAP's ECC 6.0 software, which is not at issue in the case.

Roman has described SAP's software offerings as including a product called Supplier Relationship Management ("SRM"), which is part of SAP's Business Suite and is used to pay supplier invoices. (Roman Second Expert Report ¶ 141.) In addition, SAP provides software called ERP Central Component ("ECC"), which operates as the core "engine" of SAP business software. (*Id.* ¶ 144.) Roman testified that, in conducting his forensic analysis and comparison, he obtained SAP source code for "an all-in-one package that includes EEC and SRM." (Roman Dep. 71:18-19.) In response to questioning by Accenture's counsel, Roman confirmed that the SAP source code he

examined was from a "standard SAP/SRM distribution" and a "standard distribution of SAP's ECC software." (*Id.* 89:1-9, 91:8-10.) When Roman identified the portions of SAP's source code that were similar to Wellogix's source code, the SAP source code containing the matches were from SAP's ECC software. (*Id.* 10:11-22.) Roman states that the ECC software was SAP's "core functionality," and that source code integrated into the core functionality made it available to SAP's SRM software as well as other SAP software. (*Id.* 258:20-259:5.)

This evidence demonstrates that Roman analyzed both SRM and ECC, and not just ECC as Accenture contends. Though Roman's report found similarity between ECC and Wellogix's source code, and not between SRM and Wellogix's source code, Roman also stated that the functionality arising from ECC's source code would be made available to SRM. Roman's opinion was not based on a faulty analysis or an analysis of completely irrelevant data. If Accenture wishes to challenge Roman's reliance on ECC to support his opinion that Wellogix and SRM contained similarities, or the significance of Roman's findings with respect to ECC, it can do so on cross-examination. These issues go to the weight of Roman's opinion and not its admissibility. We decline to exclude Roman's opinion on these grounds. In sum, we deny Accenture's motion to exclude Roman as an expert.

## IV.   SUMMARY JUDGMENT LEGAL STANDARD

A motion for summary judgment requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED. R. CIV. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted).  A genuine issue of material fact

exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact but need not negate the elements of the nonmovant's case. *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1074 (5th Cir. 1997). If the movant meets this burden, then the nonmovant is required to go beyond its pleadings and designate, by competent summary judgment evidence, the specific facts showing that there is a genuine issue for trial. *Id.* The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.* Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. F.R.C.P. 56(e)(1); *See, e.g., Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996), *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts.'" (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## III. ANALYSIS

Accenture has moved for summary judgment on all of the claims alleged in Wellogix's third amended complaint. We address each of these claims below.

### A. Misappropriation of Trade Secrets

Under Texas law, a claim of trade secret misappropriation requires a plaintiff to show that (a) a trade secret existed; (b) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means; and (c) use of the trade secret without authorization from the plaintiff. *Phillips v. Frey*, 20 F.3d 623, 627 (5th Cir. 1994) (citing cases); *Avera v. Clark Moulding*, 791 S.W.2d 144, 145 (Tex. App.—Dallas 1990, no writ.). The word "use," as it appears

as an element of this offense, has been equated with "commercial use," and has been liberally defined to include both the sale of the trade secrets themselves, as well as the "commercial operation" of those trade secrets within profit-seeking endeavors. *See Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1205 (5th Cir. 1986); *Global Water Group, Inc. v. Atchley*, 244 S.W.3d 924, 930 (Tex. App.—Dallas 2008, pet. denied). Recently, the Fifth Circuit has noted with approval the even more liberal construction of the term "use" contained in the Restatement (Third) of Unfair Competition Section 40: "[a]s a general matter, any exploitation of trade secrets that is likely to result in injury to the trade secret owner or enrichment to the defendant is "use" under this Section." *General Universal Systems, Inc. v. HAL, Inc.*, 500 F.3d 444, 450-52 (5th Cir. 2007). We find that there are genuine issues of material fact with respect to all of the elements of the trade secret misappropriation claim.

### 1. Existence of Trade Secret

Wellogix has raised a fact issue as to whether its source and object code should be accorded trade secret protection. As the Arbitration Order notes, Wellogix kept its object and source code substantially secret. Even though Wellogix disclosed its object and source code to at least three companies without first obtaining a written confidentiality agreement, all of these disclosures appear to be in furtherance of the parties' economic interests. In such situations, Wellogix's object and source code may still qualify for trade secret protection. *See Phillips*, 20 F.3d at 631-32 (disclosure of trade secret without protection of express confidentiality agreement not fatal to trade secret protection where disclosure occurred during sale negotiation); *Metallurgical Industries, Inc.*, 790 F.2d at 1200-01 (limited disclosure made to further holder's economic interests does not necessarily destroy trade secret protection). In addition, Wellogix has raised a fact issue as to whether the "process workflow" for Wellogix software's integration with SAP software should be

considered a trade secret. *See Mabrey v. Sandstream,Inc.*, 124 S.W.3d 302, 311 (Tex. App.—Fort Worth 2003, no pet.) (business models related to telecommunications architecture are trade secrets); (Doc. No. 222 Ex. 22.).

### 2. Use of Trade Secret

We find that there are genuine issues of material fact with respect to whether Accenture used Wellogix's trade secrets to (1) develop complex services templates for BP, (2) develop xIEP with SAP, or (3) assist SAP to enhance SRM functionality. As to the first type of use, Wellogix has submitted evidence that Accenture developed complex services templates for BP. (Doc. No. 222 Ex. 16, 18, 19, 21.) As to the second and third types of use, Wellogix has submitted evidence that Accenture may have used Wellogix's trade secrets during its work with SAP. In at least one instance, Wellogix transmitted a "process workflow" document to Accenture which contained information about how its software could be integrated with SAP's software. (Doc. No. 222 Ex. 22.). In addition, during the time that Accenture was assisting BP to implement Global E&P P2P and had access to source code on the eTrans SharePoint site, Accenture was also working with SAP to develop the xIEP application and to enhance SRM functionality. On one hand, Accenture's employee Kostial states that scenario 3 of xIEP (development of complex services templates) was never developed. (Kostial Dep. 35:23-24, 179:6-7.) This statement is contradicted by other summary judgment evidence that information was transmitted to SAP in order for SAP and Accenture to develop scenario 3. (Doc. No. 222 Ex. 15 at 1). Even though xIEP may not have been piloted, deployed, or implemented, Accenture's purported use of Wellogix's source or object code during xIEP's development can constitute a commercial use. "Any misappropriation of trade secrets, followed by an exercise of control and domination, is considered a commercial use." *Garth v. Staktek Corp.*, 876 S.W.2d 545, 548 (Tex. App.—Austin 1994, writ dism. w.o.j.) (citing

*University Computing Co. v. Lykes--Youngstown Corp.*, 504 F.2d 518, 542 (5th Cir. 1974)). Finally, with respect to the third type of use, enhancing SAP's SRM to incorporate Wellogix's trade secrets, there is evidence that SRM's ECC core functionality, which feeds into SAP SRM, contains the same code as Wellogix's code. (Roman Dep. 258:20-259:5; Doc. No. 222 Ex. 3 (Roman Dep. Exs. 920A, 920B, 920C.); Roman Second Expert Report at ¶¶ 354-57.)   Thus, we find that there are genuine issues of material fact with respect to Accenture's "use" of Wellogix's trade secrets during and in Accenture's work for BP, Accenture's work on xIEP, and Accenture's work to enhance SRM functionality.

### 3.  Acquisition of Trade Secret

There are genuine issues of material fact with respect to both whether Accenture acquired Wellogix's trade secrets by a breach of a confidential relationship or through improper means. Regarding the confidential relationship, it is clear that Wellogix and Accenture entered into six agreements with each other, each containing confidentiality provisions. These agreements establish that a confidential relationship existed between the two companies. *IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 199 (Tex. App.—Fort Worth 2005, no pet.) (confidentiality agreement between parties supported finding of confidential relationship between parties). Further, there are genuine issues of material fact with respect to the type of information Wellogix disclosed to Accenture pursuant to these agreements, and whether this information later found its way into the complex services templates developed by Accenture, the xIEP application developed by Accenture and SAP, or enhancements to SAP SRM functionality made by incorporating Wellogix's source code into SAP's ECC core functionality. (Doc. No. 222 Ex. 22; Roman Dep. 258:20-259:5; Doc. No. 222 Ex. 3 (Roman Dep. Exs. 920A, 920B, 920C.); Roman Second Expert Report at ¶¶ 354-57.).

With respect to discovering Wellogix's trade secrets by improper means, "[i]mproper means of acquiring another's trade secrets include theft, fraud, unauthorized interception of communications, inducement of or knowing participation in a breach of confidence, and other means either wrongful in themselves or wrongful under the circumstances of the case." *Astoria Indus. of Iowa, Inc. v. SNF, Inc.*, 223 S.W.3d 616, 636 (Tex. App.—Fort Worth 2007, pet. denied). Here, the Arbitration Order notes that the eTrans SharePoint site contained some source code and computer language.[2] (Arb. Order ¶ 41.) The Arbitration Order also notes that Accenture employees were allowed to access the SharePoint site. (*Id.* ¶ 42.) Summary judgment evidence shows that Accenture claimed that xIEP would have a complex services solution and pushed SAP to represent to BP that the xIEP would offer a better solution than Wellogix's complex services software. (Doc. No. 222, Exs. 35, 36.) In addition, summary judgment evidence shows that Accenture feared being marginalized by a close relationship between SAP and Wellogix. (Doc. No. 222, Ex. 38.) Finally, summary judgment evidence shows that Accenture possessed information created by Wellogix and BP for the eTrans project and for other proejcts. (Greene Dep. 129:6-130:4; Doc. No. 222 Ex. 22.) Viewing this evidence in the light most favorable to Wellogix, we find that it would enable a reasonable juror to reach a conclusion that Accenture improperly obtained Wellogix's trade secrets via the SharePoint site in order to buttress its own xIEP application and enhance SRM functionality.

### 4.  Plaintiff suffered Injury

The summary judgment evidence raises a fact issue as to whether Wellogix suffered an injury as a result of Accenture's purported use of Wellogix's trade secrets. The summary judgment evidence shows that Accenture may have used Wellogix's trade secrets in xIEP and to enhance

---

[2] As Accenture did not participate in the arbitration, we do not give preclusive effect to the Arbitration Order's finding that the SharePoint site contained Wellogix's object and source code, insofar as this finding is used against Accenture. We simply note that evidence was presented during the Arbitration that led to this finding, and that this evidence raises a genuine issue of material fact with respect to whether the SharePoint site contained Wellogix's source and object code, and whether Accenture employees were allowed to and, in fact, did access the site.

SRM functionality. Accenture attempted to replace Wellogix's complex services functionality with its own development of a complex services solution or to enhance SRM's functionality to include complex services functions. Accenture communicated with BP and SAP to dissuade them from going forward with Wellogix's complex services solution. This evidence could lead a reasonable juror to conclude that Wellogix did not continue work with BP and SAP as a result of Accenture's use of Wellogix's trade secrets to replicate a complex services solution in xIEP and SRM. In addition, Accenture's development of complex services templates similarly may have led BP to forego a relationship with Wellogix for provision of Wellogix's complex services solution, thereby causing Wellogix an injury.

In sum, the summary judgment evidence raises fact issues with respect to all of the elements of a trade secret misappropriation claim. We deny summary judgment to Accenture on this claim.

**B. Texas Theft Liability Act**

Wellogix has brought three separate claims under the Texas Theft Liability Act ("TLA")—theft of property, theft of services, and theft of trade secrets. For all TLA claims, the plaintiff must establish: (1) the plaintiff had a possessory right to property or was the provider of services; (2) the defendant unlawfully appropriated property or unlawfully obtained services in violation of certain sections of the Penal Code; and (3) the plaintiff sustained damages as a result of the theft. Tex. Civ. Prac. & Rem. Code §§ 134.002(2), 134.003, 134.005(a); Tex. Penal Code §§ 31.03(a), 31.05. Deprive means, among other things, "to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner." Tex. Penal Code § 31.01. "Appropriation of property is unlawful if it is without the owner's effective consent." *Id*. § 31.01(2).

With respect to theft of trade secrets, a plaintiff may establish this claim by showing (1) without Wellogix's consent; (2) Accenture stole Wellogix's trade secret, made a copy of an article representing the trade secret, or communicated or transmitted a trade secret. Tex. Penal Code § 31.05. The theft claim based on theft of trade secrets rests on the same evidence as Wellogix's trade secret misappropriation claim. *See SP Midtown, Ltd v. Urban Storage, L.P.*, 2008 Tex. App. LEXIS 3364, *21 n.8 (Tex. App.—Houston May 8, 2008, pet. denied) (though "the elements of a statutory claim and a common law claim of misappropriation are not exactly the same, we conclude the same evidence supports both causes of action.") For the same reasons we have found that genuine issues of material fact exist with respect to Wellogix's trade secret misappropriation claim, we find that genuine issues of material fact exist with respect to Wellogix's theft of trade secrets claim.

With respect to theft of property, Wellogix must demonstrate that Accenture possessed an intent to deprive Wellogix of its property permanently or for an extended period of time. Tex. Penal Code § 31.03. Wellogix has not come forward with evidence that Accenture possessed such intent. Although Accenture may have been provided with or improperly obtained copies of Wellogix's complex services solution and source and object code, there is no suggestion that Accenture prevented Wellogix from retaining copies of these items or intended to do so. Without such intent, Wellogix cannot demonstrate that Accenture committed a theft of property. We grant summary judgment to Accenture on the theft of property claim.

With respect to Wellogix's theft of services claim, Accenture contends that Wellogix did not provide it with any service, and that, even if a service was rendered, Wellogix did not seek compensation for this service. Accenture cites the deposition of Wellogix employee Ike Epley as evidence that Wellogix did not provide "services" to Accenture other than giving Accenture its "Marathon relationship." Even if we assume that Wellogix's assistance to Accenture in creating a

business relationship with Marathon constitutes a service, Wellogix has not pointed to any evidence that Accenture knew that this service was provided in exchange for compensation. *See* Tex. Penal Code § 31.04(a) (element of theft of services is that defendant possesses intent to avoid payment for service that he knows is provided only for compensation). Wellogix has not shown that there is a genuine issue of fact in dispute with respect to the theft of services claim and therefore we grant summary judgment to Accenture regarding this claim.

## C. Breach of Fiduciary Duty

The elements of a breach of fiduciary duty claim under Texas law are: (1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant. *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007). "A fiduciary relationship exists when the parties are under a duty to act for or give advice for the benefit of another upon matters within the scope of the relationship." *Stephanz v. Laird*, 846 S.W.2d 895, 901 (Tex. App.—Houston 1993, pet. denied). Texas law recognizes two types of fiduciary relationships. The first, a formal fiduciary relationship, "arises as a matter of law and includes the relationships between attorney and client, principal and agent, partners, and joint venturers." *Id.* (quoting *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508 (Tex. App.--Houston [1st Dist.] 2003, no pet.)). The second, an informal fiduciary relationship, may arise in the context of informal moral, social, domestic, or personal relationships in which one person trusts and relies on another. *Crim Truck & Tractor Co. v. Navistar Int'l*, 823 S.W.2d 591, 594 (Tex. 1992). "However, a fiduciary relationship is an extraordinary one and will not be lightly created; the mere fact that one subjectively trusts another does not, alone, indicate that he placed confidence in another in the sense demanded by fiduciary relationships because something apart from the transaction between the

parties is required." *American Medical Int'l, Inc. v. Giurintano*, 821 S.W.2d 331, 339 (Tex. App.—Houston 1991, no pet.).

### 1. Formal Fiduciary Relationship

Accenture argues that none of the six agreements entered into between Wellogix and Accenture gives rise to a formal fiduciary relationship between the two entities. It is unclear whether Wellogix contends that these agreements create a formal fiduciary relationship.

Joint venturers owe a formal fiduciary duty to each other in dealings within the scope of the joint venture. *Rankin v. Naftalis*, 557 S.W.2d 940, 944 (Tex. 1977). The elements of a joint venture are (1) mutual right of control, (2) community interest, (3) the sharing of profits as principals, and (4) the sharing of loses, costs or expenses. *Taylor v. GWR Operating Co.*, 820 S.W.2d 908, 911 (Tex. App.—Houston 1991, pet. denied). None of the agreements between Wellogix and Accenture creates a joint venture relationship between the two companies such that the agreements can be said to give rise to a formal fiduciary relationship. The Mutual Nondisclosure Agreement is merely an agreement to keep certain proprietary information confidential. (Doc. No. 222 Ex. 29.) The Marketing Alliance Agreement provides that Wellogix and Accenture engage in a joint marketing plan of Wellogix's software and Accenture's integration services to target companies in the oil and gas E&P sector. Each company was to bear its own costs. (Doc. No. 222 Ex. 30.) Wellogix's Subcontract with Accenture involves Accenture paying Wellogix a fixed sum of money in exchange for Wellogix's provision of software and technical services during the implementation of Wellogix's software at Marathon Oil Company. (Doc. No. 222 Ex. 31.) The Subscription Agreement between Wellogix and Accenture grants Accenture a license to use Wellogix's software and services. (Doc. No. 222 Ex. 32.) Finally, the two Teaming Agreements simply provide that Wellogix and Accenture would work together to submit joint proposals to oil companies that had

issued requests for proposals. Both agreements provide that each party would bear their own expenses and costs. (Doc. No. 222 Ex. 33, 34.) We conclude that, on the basis of these agreements, Wellogix and Accenture did not have a formal fiduciary relationship.

### 2. Informal Fiduciary Relationship

Accenture also argues that the six agreements between Wellogix and Accenture do not give rise to an informal fiduciary relationship. Wellogix contends that six agreements are evidence that an informal fiduciary relationship existed between Accenture and Wellogix such that Accenture was obligated to exercise good faith and fair dealing towards Wellogix.

Generally, "while a fiduciary relationship or confidential relationship may arise from the circumstances of a particular case, to impose such a relationship in a business transaction, the relationship must exist prior to, and apart from the agreement made the basis of the suit." *Willis v. Donnelly*, 199 S.W.3d 262, 277 (Tex. 2006) (quoting *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997)). Mere subjective trust alone is not enough to transform arms-length dealing into a fiduciary relationship. *Crim Truck & Tractor Co.*, 823 S.W.2d at 595. A fiduciary relationship may arise either as a result of dominance on the part of one, or weakness and dependence on the part of the other, such as may exist in contractor/subcontractor relationships. *Texas Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 507 (Tex. 1980). Whether such a duty exists depends on the circumstances. *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.–Houston 2008). The existence of an informal fiduciary relationship is ordinarily a question of fact, but when the underlying facts are undisputed, it becomes a question of law. *Crim Truck & Tractor Co.*, 823 S.W.2d at 594; *Anglo-Dutch Pet. Int'l v. Smith*, 243 S.W.3d 776, 782 (Tex. App.—Houston 2007, pet. denied).

As an initial matter, we decline to send to the jury the issue of whether an informal fiduciary relationship existed. The material issues of fact relevant to this inquiry are undisputed. Wellogix relies on the six agreements between Wellogix and Accenture as the basis for the informal fiduciary relationship. It does not cite any other evidence as support for the existence of the fiduciary relationship. Accenture does not dispute that these agreements exist. In turn, Accenture relies upon Wellogix employees' professed distrust of Accenture as evidence that no informal fiduciary relationship existed. Wellogix does not dispute its employees' attitudes towards and characterization of Accenture. The only dispute between the parties is whether this collection of evidence—the six agreements and the emails of Wellogix employees—establishes an informal fiduciary relationship. This is an issue of law that is appropriate for the Court to decide at this juncture since Wellogix has not identified any genuine issues of material fact that should be presented to the jury.

Neither party has identified the agreement, if any, between Wellogix and Accenture that serves as the basis of this suit. Rather, the allegations of a breach of fiduciary duty appear to be based upon Accenture's actions while acting as BP's agent in selecting software platform vendors during BP's Global E&P P2P project, which began in 2004. In order to determine whether an informal fiduciary relationship existed between Wellogix and Accenture, we must determine whether the parties' relationship prior to 2004 and separate from the Global E&P P2P activities gave rise to a fiduciary obligation.

The Mutual Nondisclosure Agreement, the Marketing Alliance Agreement, the two Teaming Agreements were all agreements between Accenture and Wellogix to jointly exchange information with each other in order to develop business opportunities to which both would contribute particular expertise and from which both would benefit. As such, these agreements are "arms-length

transactions entered into for the parties' mutual benefit, and thus do not establish a basis for a fiduciary relationship." *Meyer v. Cathey*, 167 S.W.3d 327, 331 (Tex. 2005) (citing *Associated Indem. Corp. v. CAT Contr.*, 964 S.W.2d 276, 288 (Tex. 1998)). The Subscription Agreement is merely a license agreement in which Accenture obtained a license to use certain intellectual property owned by Wellogix in exchange for a fee. The Subcontract between Accenture and Wellogix does not reflect a relationship in which Accenture was a dominant party and Wellogix a weak one. Wellogix provided the key software for implementation at Marathon and Accenture implemented that software. Wellogix was compensated for its software and services. The Teaming Agreements are not subcontractor agreements and explicitly provide that each party is an independent contractor.

Any expectation that Wellogix may have had under the Subcontract that Accenture would act in its best interests was contradicted by the express language of other agreements. In the Mutual Nondisclosure Agreement, Wellogix acknowledged that Accenture retained the right to develop, use, and market products and services competitive and similar to Wellogix's own products, subject to the confidentiality and non-disclosure provisions in the agreement. In the Marketing Alliance Agreement, Wellogix acknowledged that the alliance between the two companies was not exclusive.

Finally, Wellogix argues that the confidentiality and non-disclosure provisions in the agreements created a special relationship of trust and confidence between the parties to support the existence of a *fiduciary* relationship. These confidentiality provisions related to Wellogix's proprietary information, including intellectual property and software, and limited Accenture's ability to use, disclose, or rely upon Wellogix's proprietary information. The agreements certainly gave rise to Wellogix's expectation that Accenture would abide by the confidentiality provisions

contained in them. However, "[r]eliance on another party to perform its obligations under an agreement is not sufficient to establish a confidential relationship." *Swinehart v. Stubbeman*, 48 S.W.3d 865, 882 (Tex. App.—Houston 2001, pet. denied). The agreements here do not automatically create fiduciary duties simply because they were confidentiality agreements. *See Anglo-Dutch Pet. Int'l, Inc.*, 243 S.W.3d at 783 ("To the extent Smith's position equates a confidentiality agreement to a relationship of trust and confidence giving rise to a fiduciary duty, he has cited, and we have found, no authority supporting the notion that confidentiality agreements can create fiduciary relationships.") Rather, the dealings between the parties must show that one part is justified in relying on the other to act in his best interest. *Stephanz*, 846 S.W.2d at 902. The confidentiality agreements and provisions do not support such a conclusion.

Therefore, we find that no informal fiduciary relationship existed between Wellogix and Accenture. Without the existence of either a formal or informal fiduciary relationship, Wellogix cannot make out a claim for breach of fiduciary duty. We need not examine the second and third elements of this claim—i.e., whether a breach occurred and whether Wellogix was injured or Accenture benefited. We grant summary judgment to Accenture on Wellogix's claim of breach of fiduciary duty.

### D.  Aiding and Abetting a Breach of Fiduciary Duty

In its complaint, Wellogix alleges that Accenture aided and abetted a breach of fiduciary duty. Specifically, Wellogix's third amended complaint states that Accenture knew that SAP's actions constituted a breach of fiduciary duty to Wellogix, and that Accenture assisted and encouraged SAP in its breach of fiduciary duty. Accenture has moved for summary judgment on this claim. In its response brief, Wellogix does not address the fiduciary duty alleged owed to it by SAP. Instead, Wellogix focuses on the fiduciary duty owed to it by BP and Accenture's acts that

aided and abetted BP's breach of fiduciary duty. In its reply brief, Accenture argues that Wellogix failed to plead an aiding and abetting claim based on BP's breach of fiduciary duty, and that Wellogix has abandoned its claim of aiding and abetting SAP's breach of fiduciary duty.

Texas law recognizes that, "where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tort-feasor with the fiduciary and is liable as such." *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942). We address each of Wellogix's factual theories in turn.

### 1.  Aiding and Abetting SAP's Breach of Fiduciary Duty

Key to Wellogix's claim that Accenture aided and abetted SAP's breach of fiduciary duty is the existence of a fiduciary relationship between SAP and Wellogix. The evidence cited by Accenture as relevant to the existence of a fiduciary relationship between SAP and Wellogix is the NetWeaver Cooperation Agreement executed in March 2005, personal relationships between Wellogix's executives and SAP's employees, and participation by Wellogix's executives in SAP's product conferences. Wellogix does not dispute that this evidence is relevant or cite any evidence that might give rise to a genuine issue of material fact.

We find that this evidence does not support the existence of a formal fiduciary relationship. The NetWeaver Cooperation Agreement expressly disclaims the creation of a partnership or joint venture relationship between SAP and Wellogix. (Doc. No 210 Ex. 30 § 8.4; Doc. No. 210 Ex. 31 § 18.3.) In addition, the agreement provides that each party shall bear its own costs with respect to their own activities under the agreement. (Doc. No. 210 Ex. 30 § 3.5.) We do not believe that this agreement creates a joint venture relationship that would give rise to a formal fiduciary duty. *See Rankin*, 557 S.W.2d at 944.

With respect to an informal fiduciary relationship, the relationship between Wellogix and SAP must have existed prior to and apart from the agreement that is the basis of the suit. *See Willis*, 199 S.W.3d at 277. Here, the NetWeaver Cooperation Agreement, and SAP's alleged failure to comply with its terms, serves as the basis of Wellogix's suit. Wellogix has not come forward with any evidence that Wellogix and SAP entered into agreements or engaged in activities prior to and separate from the NetWeaver Cooperation Agreement that would give rise to SAP's fiduciary obligation to Wellogix. Therefore, we find that Wellogix was not engaged in an informal fiduciary relationship with SAP. Without either a formal or informal fiduciary relationship, Wellogix cannot show that SAP breached its fiduciary duty towards Wellogix. In turn, without a breach of a fiduciary duty, Wellogix cannot show that Accenture aided and abetted the breach of a fiduciary duty.

## 2. Aiding and Abetting BP's Breach of Fiduciary Duty

It is clear that Wellogix did not plead a claim for aiding and abetting breach of fiduciary duty that is based on BP's breach of fiduciary duty. Even if it had timely pled this claim, Wellogix has not cited any evidence sufficient to establish or raise a genuine issue of material fact with respect to the existence of a fiduciary relationship between BP and Wellogix.

With respect to a formal fiduciary relationship, the MSLA does not create a joint venture relationship between Wellogix and BP. Instead, the MSLA is a license agreement under which Wellogix provided a license to BP for use of Wellogix's software and software-related services in exchange for a license fee. With respect to an informal fiduciary relationship, we must examine the relationship between Wellogix and BP as it existed prior to and separate from the MSLA, which serves as the basis of Wellogix's claim that BP breached its fiduciary duty to Wellogix. Although there were a number of agreements between Wellogix and BP beginning in 2000 and leading up to

the MSLA's execution in 2004, none of these agreements is anything other than an arms-length transaction entered into for the parties' mutual benefit. *Meyer*, 167 S.W.3d at 331. Although the agreements impose confidentiality provisions upon the parties, these provisions are insufficient to transform a contractual relationship into a fiduciary relationship. *Anglo-Dutch Pet. Int'l*, 243 S.W.3d at 782. Again, without the existence of a formal or informal fiduciary relationship, Wellogix cannot show a breach of a fiduciary relationship or Accenture's aiding and abetting of the breach.

Thus we grant summary judgment to Accenture on Wellogix's claims of aiding and abetting a breach of fiduciary duty.

### E. Breach of Confidence and Trust

Accenture has moved to dismiss Wellogix's claim of breach of confidence and trust and has also moved for summary judgment on this claim. (Docs. No. 206, 210.) Wellogix has not opposed either the motion to dismiss or the motion for summary judgment regarding this claim.

Contrary to Accenture's argument, Texas courts have recognized that a breach of confidence claim may be brought separately from a trade secret misappropriation claim. *See United States Sporting Prods. v. Johnny Stewart Game Calls*, 865 S.W.2d 214, 218 (Tex. App.—Waco 1993, pet. denied); *see also Tavana v. GTE Southwest*, 1999 Tex. App. LEXIS 5365, *7 (Tex. App.—Dallas July 21, 1999). However, Texas courts also have noted that a "breach of confidence" claim based upon a defendant's use of plaintiff's trade secrets in violation of a confidential relationship that results in plaintiff's injuries is identical to a trade secret misappropriation claim. *Hyde Corp. v. Huffines*, 158 Tex. 566, 587 (1958); *K & G Oil Tool & Service Co. v. G & G Fishing Tool Svc.*, 158 Tex. 594, 610 (1958); *Tavana*, 1999 Tex. App. LEXIS 5365 at *7. The allegations in Wellogix's complaint corresponding to the breach of confidence and trust claim simply restate the allegations that serve as the basis of Wellogix's trade secret misappropriation claim. Therefore, Wellogix's

factual allegations in this regard shall be analyzed in an identical fashion to Wellogix's trade secret misappropriation claim. We grant Accenture's motion to dismiss and dismiss Wellogix's breach of confidence and trust claim.

### F. Tortious Interference with an Existing Contract

To establish tortious interference with an existing contract, a plaintiff must show: (1) plaintiff had a valid contract; (2) the defendant willfully and intentionally interfered with that contract; (3) the interference proximately caused the plaintiff damage; and (4) the plaintiff suffered actual damage or loss. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex. 2002). "Establishing causation requires that the plaintiff bring forth sufficient facts so that the evidence, and logical inferences drawn from the evidence, support a reasonable probability that the defendant's acts or omissions were a substantial factor in bringing about injury." *Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 474 (Tex. App.—Houston 2006, pet. denied).

In its complaint, Wellogix alleged that Accenture had interfered with the MSLA between Wellogix and BP and with the NetWeaver Cooperation Agreement between Wellogix and SAP. Accenture moved for summary judgment on both these claims. In its response, Wellogix focused only upon Acccenture's alleged interference with the BP contract and did not address its claim regarding the SAP contract. As such, we find that Wellogix has abandoned its theory of tortious interference with the NetWeaver Cooperation Agreement. *See Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1164 (5th Cir. 1983) (plaintiff abandoned theory pleaded in complaint but not raised in opposition to summary judgment motion).

As for the remaining theory—interference with the MSLA—Accenture argues that there is no evidence to support Wellogix's claim that Accenture interfered with this agreement or any others between Wellogix and BP. With respect to the first element of tortious interference, the existence of

a valid contract between Wellogix and BP (i.e., the MSLA) does not appear to be in dispute. In addition, Wellogix cites to other agreements between Wellogix and BP, and Accenture does not contest that these agreements exist and are valid.

With respect to the second element, Wellogix has not come forward with evidence showing a genuine issue of material fact with respect to Accenture's interference with the MSLA or any other agreement that existed between Wellogix and BP. Wellogix cites emails among Accenture and SAP in which Accenture strenuously opposes Wellogix's participation in xIEP meetings. (Doc. No. 222 Exs. 10, 11, 12.) These emails, however, do not pertain to eTrans project, the MSLA, or Wellogix's relationship with BP generally. They do not support an inference that Accenture acted improperly with respect to Wellogix's business relationship with BP. Another email from an Accenture employee expressing hope that Wellogix loses favor with BP does not amount to direct action by Accenture towards BP to interfere with Wellogix's relationship with BP. (Doc. No. 222, Ex. 14.) An email between Accenture and Wellogix that expresses frustration over the companies' mutual dealings and over each companies' relationship with SAP does not provide evidence that Accenture conducted activities vis-à-vis BP. (Doc. No. 222, Ex. 13.) Finally, an email among Accenture employees that expresses their fears of being marginalized by Wellogix focuses specifically on Wellogix's potential sale to SAP, not Wellogix's relationship with BP. (Doc. No. 222 Ex. 38.) This email does not provide support for the claim that Accenture somehow interfered with Wellogix's contracts with BP. All of this summary judgment evidence shows that Accenture harbored suspicion towards Wellogix's relationship with SAP and perhaps acted in a way to prevent Wellogix from moving forward with SAP or on the xIEP project. However, this evidence does not raise genuine issues of material fact regarding any interference by Accenture of Wellogix's relationship with BP.

Without evidence of interference by Accenture of Wellogix's relationship with BP, we need not examine whether BP's breach of the MSLA was caused by Accenture's interference, nor whether Wellogix was damaged by the interference or breach. We grant summary judgment to Accenture on Wellogix's claim of tortious interference with an existing contract.

### G. Tortious Interference with Prospective Business Relations

Accenture has moved for summary judgment on Wellogix's tortious interference with prospective business relations claim. Wellogix has stated that it will not be pursuing a claim for tortious interference with prospective contracts. (Doc. No. 222 at 3 n.1.) Thus, we grant summary judgment to Accenture on Wellogix's claim of tortious interference with prospective business relations.

### H. Conspiracy

To prevail on a claim of conspiracy, a plaintiff must establish: (1) a combination of two or more persons; (2) an object to be accomplished (an unlawful purpose or a lawful purpose by unlawful means) (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Insurance Co. of N. Am. v. Morris*, 981 S.W.2d 667, 675 (Tex. 1998); *see also Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 857 (Tex. 1968) ("There must be an agreement or understanding between the conspirators to inflict a wrong against, or injury on, another, a meeting of minds on the object or course of action, and some mutual mental action coupled with an intent to commit the act which results in injury; in short, there must be a preconceived plan and unity of design and purpose, for the common design is of the essence of the conspiracy.").

We first examine whether Wellogix has raised a genuine issue of material fact regarding a meeting of the minds between Accenture and SAP to commit the intentional torts in this case—

trade secret misappropriation, theft, and tortious interference with an existing contract. Accenture has submitted summary judgment evidence from Accenture and SAP employees denying that they had any agreement or intent to steal Wellogix's trade secrets or prevent Wellogix from fulfilling its contracts. In opposition, Wellogix cites deposition testimony showing that Accenture contained a division of employees that implemented SAP, employed individuals known as SAP specialists, developed xIEP in tandem in with SAP, and established a knowledge sharing center at SAP's office in Germany. Wellogix also cites emails among Accenture and BP employees discussing potential litigation between Wellogix and SAP over the use of Wellogix's intellectual property. (Doc. No. 222 Exs. 23, 24, 25, 26, 27, 28.) Wellogix cites emails among Accenture employees (and one email between Accenture and Wellogix) regarding Accenture's position towards Wellogix, fears over Wellogix's potential acquisition by SAP, and concerns over Wellogix's business relationship with SAP and BP. (Doc. No. 222 Exs. 7, 13, 14, 15, 37, 38.) Wellogix has also cited to emails regarding work that Accenture performed for BP on the creation of complex services templates. (Doc. No. 222 Exs. 16, 18-22.) None of this evidence, however, establishes SAP's intention to do anything with respect to Wellogix's intellectual property or Wellogix's contracts with BP. Rather, this evidence simply shows that Accenture and SAP had a close working relationship. In addition, Accenture was wary of Wellogix's potential to edge Accenture out of a role at SAP and at BP. Though Accenture may have moved forward in committing wrongful acts, this evidence does not establish that SAP intended to join Accenture in doing so.

There are a few pieces of summary judgment evidence that deserve further discussion. In one email sent among Accenture employees, an Accenture employee recounts a discussion she had with an SAP employee (Doc. No. 222, Ex. 35). As summarized in the email, the SAP employee does not express any thoughts suggesting stealing or misappropriating Wellogix's intellectual

property. In addition, what the SAP employee planned to discuss with BP does not include comments that would interfere with BP's contracts with Wellogix. Similarly, there is an email written by an Accenture employee to an SAP employee expressing concern over competition posed by Wellogix to xIEP. (Doc. No. 222, Ex. 36.) However, this email does not reflect SAP's intention to commit any wrongful act with respect to Wellogix's intellectual property or Wellogix's contracts. Finally, a group of emails among Accenture and SAP employees discuss Accenture's position regarding a Wellogix/SAP solution and a Wellogix/xIEP solution. (Doc. No. 222, Exs. 8, 9, 10, 11, 12.) These emails show that SAP intended to continue partnering with Wellogix, even going as far as to ensure that Wellogix would be invited to participate in a xIEP partners meeting despite Accenture's objection. Far from suggesting that SAP had a meeting of the minds with Accenture to steal or misappropriate Wellogix's trade secrets or interfere with Wellogix's contracts, these emails in fact show that SAP and Accenture parted ways significantly in their approach to Wellogix.

In sum, Wellogix has not raised a genuine issue of material fact with respect to the "meeting of the minds" element of conspiracy. As such, we need not review the other elements of the conspiracy claim. Summary judgment is granted to Accenture on Wellogix's conspiracy claim.

## IV.   CONCLUSION

Accenture's Motion for Summary Judgment, (Doc. No. 210), is **GRANTED IN PART** and **DENIED IN PART**:

(1) Summary judgment is denied on Wellogix's claim of trade secret misappropriation;

(2) Summary judgment is denied on Wellogix's claim of theft of trade secrets. Summary judgment is granted to Accenture on Wellogix's claims of theft of property and theft of services;

(3) Summary judgment is granted to Accenture on Wellogix's claim of breach of fiduciary duty;

(4) Summary judgment is granted to Accenture on Wellogix's claim of aiding and abetting a breach of fiduciary duty;

(5) Summary judgment is denied on Wellogix's claim of breach of confidence and trust;

(6) Summary judgment is granted to Acenture on Wellogix's claim of tortious interference with an existing contract;

(7) Summary judgment is granted to Accenture on Wellogix's claim of tortious interference with prospective business relations; and

(8) Summary judgment is granted to Accenture on Wellogix's claim of conspiracy.

Accenture's Motion to Exclude Wellogix's Proposed Expert Witness Kendyl Roman (Doc.

No. 212) is **DENIED**. Accenture's Motion to Dismiss (Doc. No. 206) is **GRANTED**. Wellogix's

breach of confidence and trust claim is **DISMISSED**.

**IT IS SO ORDERED.**

**SIGNED** this the $\underline{22}^{nd}$ day of April, 2011.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

42