## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **WELLOGIX, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Case No. 3:08-cv-119** |
| | § | |
| **ACCENTURE, LLP,** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM AND ORDER

Pending before the Court is Accenture's Rule 50(b) Renewed Motion for Judgment as a Matter of Law (Doc. No. 311) and Accenture's Motion for New Trial or Remittitur (Doc. No. 312). Upon considering the motions, all responses thereto, and the applicable law, the Court finds that the Rule 50(b) Renewed Motion for Judgment as a Matter of Law must be denied, and the Motion for New Trial or Remittitur must be granted in part and denied in part.

## I.     BACKGROUND

Plaintiff Wellogix, Inc. ("Plaintiff" or "Wellogix") filed suit against Defendant Accenture, LLP ("Defendant" or "Accenture") for several claims related to Accenture's wrongful conduct vis-à-vis Wellogix's intellectual property.[1] On April 22, 2011, the Court granted in part and denied in part Accenture's motion for summary judgment (the "April 22, 2011 Order"). (Doc. No. 237.) The parties proceeded to trial on May 9, 2011 on Wellogix's claims for misappropriation of trade secrets under Texas common law and theft of trade secrets

---

[1] Wellogix originally filed suit against BP America, Inc. ("BP"), Accenture, and SAP America, Inc. ("SAP"). SAP was dismissed from the case due to improper venue. (Doc. No. 54.) Pursuant to a stipulation by the parties, Wellogix's action against BP was severed from the case against Accenture. (Doc. Nos. 106, 107.) Wellogix and BP agreed to arbitrate the claims between them, with Judge Keith P. Ellison acting as sole arbitrator. (Doc. No. 109.) The private arbitration between Wellogix and BP was held from June 22, 2010 through July 2, 2010. The arbitrator's findings of fact and conclusions of law were issued in August 2010 (the "Arbitration Order").

under the Texas Theft Liability Act ("TTLA"). Accenture moved for judgment as a matter of law under Rule 50(a) at the close of Wellogix's case-in-chief and reurged its motion at the close of all evidence. (5/17/11 Tr. 1522-33; 5/18/11 Tr. 2097.) On May 20, 2011, the jury returned a verdict in favor of Wellogix on both counts and awarded compensatory damages of $26,179,725 and exemplary damages of $68,200,000. (Doc. No. 298.) On June 15, 2011, the Court ordered Accenture to file its Rule 50(b) and 59 motions prior to the entry of judgment. (Doc. No. 306.) Accenture has filed its Rule 50(b) renewed motion for judgment as a matter of law and Rule 59 motion for a new trial. The motions, having been briefed and orally argued, are ripe for disposition.

## II.    RULE 50(b) RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

### A.  Legal Standard

Under Federal Rule of Civil Procedure 50, a motion for judgment as a matter of law may be granted if a trial court finds that a "reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). "The decision to grant a directed verdict . . . is not a matter of discretion, but a conclusion of law based upon a finding that there is insufficient evidence to create a fact question for the jury." *Omnitech Int'l v. Clorox Co.*, 11 F.3d 1316, 1323 (5th Cir. 1994) (omitting internal citations and quotation). There is no legally sufficient evidentiary basis when "'the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict.'" *Rubinstein v. Adm'rs of the Tulane Educ. Fund*, 218 F.3d 392, 401 (5th Cir. 2000) (quoting *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (en banc), *overruled on other grounds by Gautreaux v. Scurlock Marine, Inc*., 107 F.3d 331 (5th Cir. 1997) (en banc)).

In evaluating such a motion, the court is to view the entire trial record in the light most favorable to the non-movant and draw all inferences in its favor, without making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Becker v. PaineWebber, Inc.*, 962 F.2d 524, 526 (5th Cir. 1992). The court must "give credence to . . . that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Wallace v. Methodist Hospital Sys.*, 271 F.3d 212, 210 (5th Cir. 2001) (quoting *Reeves*, 530 U.S. at 151). Finally, "there must be more than a mere scintilla of evidence in the record to render the grant of JMOL inappropriate." *Wallace*, 271 F.3d at 219.

### B.  Misappropriation of Trade Secrets

Under Texas law, a claim of trade secret misappropriation requires a plaintiff to show (a) that a trade secret existed; (b) that the trade secret was acquired through a breach of a confidential relationship or discovered by improper means; and (c) use of the trade secret without authorization from the plaintiff. *See Phillips v. Frey*, 20 F.3d 623, 627 (5th Cir. 1994) (citing cases); *Avera v. Clark Moulding*, 791 S.W.2d 144, 145 (Tex. App.—Dallas 1990, no writ.). To establish a theft of trade secrets claim under the TTLA, a plaintiff must establish that, without its consent, the defendant knowingly stole its trade secret, made a copy of its trade secret, or communicated or transmitted its trade secret. Tex. Civ. Prac. & Rem. Code §§ 134.002(2), 134.003, 134.005(a); Tex. Penal Code § 31.05. A claim based on theft of trade secrets rests on the same evidence as a trade secret misappropriation claim. *See SP Midtown, Ltd v. Urban Storage, L.P.*, 2008 Tex. App. LEXIS 3364, *21 n.8 (Tex. App.—Houston May 8, 2008, pet. denied) (though "the elements of a statutory claim and a common law claim of misappropriation are not exactly the same, we conclude the same evidence supports both causes of action.")

Accenture contends that it is entitled to judgment as a matter of law because Wellogix did not present legally sufficient evidence to meet its burden of proof with respect to any element of its trade secret misappropriation and theft of trade secrets claims.

## 1.  Existence of Trade Secret

A trade secret is any formula, pattern, device or compilation of information used in one's business, and which gives one an opportunity to obtain an advantage over competitors who do not know or use it. *See Hyde Corp. v. Huffines*, 314 S.W.2d 763, 776 (Tex. 1958) (adopting Restatement of Torts § 757 (1939)), *cert. denied*, 358 U.S. 898. To determine whether a trade secret exists, a court weighs six fact-intensive factors: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of the measures taken to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *See In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003) (citing Restatement of Torts § 757 cmt. b. (1939); Restatement (Third) of Unfair Competition § 39 reporter's note cmt. d. (1995)).

We find that Wellogix presented sufficient evidence to allow a jury to conclude that trade secrets existed. First, Wellogix presented evidence that the source code for its software was a trade secret and was maintained behind a firewall to ensure its secrecy. (5/10/11 Tr. 285; 5/11/11 Tr. 513-14; 5/12/11 Tr. 802.) Second, Wellogix presented evidence that the logic behind its software, including the steps required for the software to work, the software architecture, product maps and designs, and workflows, were all trade secrets. (5/10/11 Tr. 285; 5/12/11 Tr. 801-02.) Accenture's expert Deon Smith ("Smith") confirmed that Wellogix's software performed certain

functions that could not be performed by SAP's software. (5/18/11 Tr. 1932.) The jury was also presented with documentary evidence indicating that, though the functions of Wellogix's software were known to the industry, other software companies did not have identical functions in their software. (PX 496; PX 894.)[2]  This evidence, which the jury assessed using the *Bass* factors outlined in the jury instructions, provides a legally sufficient basis for the jury's conclusion that trade secrets existed.

Accenture raises several arguments as to why the evidence presented could not support the jury's finding of trade secret existence. First, Accenture contends that, at the time of the alleged misappropriation and theft, all of Wellogix's technology was covered by patents or patent applications, thereby destroying the secrecy necessary for trade secret status under Texas law. Texas law recognizes that information published in a patent application becomes public and loses trade secret status. *See Tewari De-Ox Sys.*, 637 F.3d at 612; *Frey*, 20 F.3d at 629; *Luccous v. J. C. Kinley Co.*, 376 S.W.2d 336, 340 (Tex. 1964). However, Texas law also recognizes that trade secret status may be maintained along with patent protection in situations where the patent does not disclose the exact information or details that a plaintiff contends are trade secrets. *See Frey*, 20 F.3d at 629 (manufacturing process protected by trade secret status where patent merely described the product, and failed to disclose information about the manufacturing process or specifications); *Carbo Ceramics, Inc. v. Keefe*, 166 Fed. Appx. 714, 719 (5th Cir. 2006) (jury was able to conclude, based on conflicting testimony, that patents did not disclose plaintiff's trade secrets); *cf. On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1141 (Fed. Cir. 2004) ("After a patent has issued, *the information contained within it* is ordinarily regarded as public and not subject to protection as a trade secret.") (emphasis added).

---

[2] For the purposes of this Memorandum and Order, the Court adopts the abbreviations used by the parties in this case. "PX" refers to Plaintiff's exhibits; "DX" refers to Defendant's exhibits.

Like the jury in *Carbo*, the jury here was not unreasonable in examining the evidence presented regarding Wellogix's technology and its patents and concluding that Wellogix's technology retained trade secret status.

Second, Accenture argues that PX 714, the interface design specification for a Maximo-to-Wellogix interface in the BP eTrans pilot, could not be a trade secret because it was published on Wellogix's publicly-available website. (5/13/2011 Tr. 1031-1037, 1161; DX 136.) "It is self-evident that the subject matter of a trade secret must be secret." *Luccous v. J. C. Kinley Co*., 376 S.W.2d 336, 338 (Tex. 1964). Wellogix presented testimony from its expert Kendyl Roman ("Roman") that PX 714 contained several pages of information that were trade secrets, including "Detailed Data Transformation Rules," an XML schema, "Intermediate Table Layout," and "Processing Requirements." (5/13/11 Tr. 1159-62; PX 714.) Accenture presented evidence that the XML schema contained in PX 714 was published on Wellogix's publicly available website. (*Id.* 1161; DX 136.) Accenture did not present evidence that information in PX 714 other than the XML schema was available on Wellogix's website. The jury was entitled to credit Roman's testimony that the information in PX 714 that was not available on Wellogix's website included trade secrets and was kept secret by Wellogix.

Third, Accenture argues that certain documents, such as PX 918 and PX 478/DX 98, were provided to Wellogix's customers without the protection of a confidentiality agreement, thereby losing any secrecy. (5/11/11 Tr. at 508-511; DX 120). Texas law instructs that the trade secret owner "will lose his secret by its disclosure unless it is done in some manner by which he creates a duty and places it on the other party not to further disclose or use it in violation of that duty." *Taco Cabana Int'l v. Two Pesos, Inc.*, 932 F.2d 1113, 1123-24 (citing *Furr's, Inc. v. United Specialty Advertising Co*., 385 S.W.2d 456, 459 (Tex. Civ. App.—El Paso 1964, writ

ref'd n.r.e.), *cert. denied* 382 U.S. 824 (1965)); *see also Carson Products Co. v. Califano*, 594 F.2d 453, 461 (5th Cir. 1979) (however strong other indicia of trade secret status may be, subject matter must be secret, such that acquiring information would be difficult except by improper means). Yet, "[s]ecrecy is a relative term. The information may be known to several persons and yet still be secret if third parties would be willing to pay for a breach of trust in order to ascertain it." *Taco Cabana Int'l*, 932 F.2d at 1125 (quoting *A.H. Emery Co. v. Marcan Products Corp.*, 268 F. Supp. 289, 299 (S.D.N.Y. 1967)). Courts have held that, even where a plaintiff voluntarily discloses the trade secret without the benefit of a confidentiality agreement, the requisite secrecy is retained if the "disclosure occurs in a context that would not ordinarily occasion public exposure, and in a manner that does not carelessly exceed the imperatives of a beneficial transaction." *Taco Cabana Int'l*, 932 F.2d at 1124; *see also Phillips*, 20 F.3d at 631-32 (holding that disclosure of trade secret without protection of express confidentiality agreement was not fatal to trade secret protection where disclosure occurred during sale negotiation); *Metallurgical Industries Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1200 (5th Cir. 1986) (finding no surrender of secrecy where disclosures were not public announcements and secrets divulged only to businesses with whom plaintiff dealt with expectation of profit). Here, Wellogix presented evidence that its voluntary disclosures of PX 918 and PX 478/DX 98 were made to customers or potential customers in hopes of obtaining business. Such disclosures were made to further economic transactions and would not, by themselves, expose any substantive information contained in the disclosed material to the public. Further, Epley testified that email communications transmitting trade secrets to customers and potential customers contained confidentiality notices requiring the recipient to maintain the confidentiality of the information transmitted. (5/10/11 Tr. 288; 5/11/11 Tr. 510:24-25.) The jury was not unreasonable in

weighing this evidence and concluding that Wellogix's trade secrets had not lost their secrecy through disclosure.

Fourth, Accenture argues that PX 478 and DX 98, which are substantively identical process workflows for the Maximo-to-Wellogix interface, cannot be trade secrets because the workflows were jointly created by Wellogix, SAIC, and IBM. (5/13/11 Tr. 1039; DX 120.) The Arbitration Order found that such jointly-created workflows were not trade secrets. Our April 22, 2011 Order held that this finding was entitled to preclusive effect against Wellogix, which was reiterated in the jury instruction that "[t]he architectural and process flow maps of the eTrans project that other companies took part in developing are not Wellogix trade secrets." (Doc. No. 298 at 7.) Roman, Wellogix's expert, acknowledged as much when he testified, "I wouldn't say the entire document is a trade secret based on what I now know" about "contributors from SAIC or from IBM." (5/13/11 Tr. 1039:18, 1040:4-5.) While the jury could not rely on PX 478 ad DX 98 as trade secrets in themselves, it was entitled to credit Roman's testimony that PX 478 demonstrated that Wellogix's software contained functions that were not already contained in existing software products. (5/13/11 Tr. 1039:23-1040:8.)

Fifth, Accenture argues that PX 918, which contains a "simply generic process workflow" for integration of Wellogix's Workflow Navigator and e-Field Ticket software with SAP's software, cannot be a trade secret because Epley conceded that this exhibit does not contain any trade secrets. (5/11/11 Tr. 508-510). As this testimony was uncontradicted, we must accept that the jury was not entitled to rely upon PX 918 as evidence of a trade secret.

In sum, we find that sufficient evidence underlay the jury's conclusion that trade secrets existed, even if PX 478, DX 98, and PX 918 are excluded as a proper basis for the jury's finding of trade secrets.

### 2.   Acquisition of Trade Secret

At trial, Wellogix presented sufficient evidence that Accenture had acquired Wellogix's trade secrets through a breach of a confidential relationship or discovered the trade secrets through improper means. "Improper means of acquiring another's trade secrets include theft, fraud, unauthorized interception of communications, inducement of or knowing participation in a breach of confidence, and other means either wrongful in themselves or wrongful under the circumstances of the case." *Astoria Indus. of Iowa, Inc. v. SNF, Inc.*, 223 S.W.3d 616, 636 (Tex. App.—Fort Worth 2007, pet. denied). The existence of a confidentiality agreement between two parties can establish that a confidential relationship existed between those parties. *See IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 199 (Tex. App.—Forth Worth 2005, no pet.).

Wellogix presented evidence through the testimony of Epley and Roman that it had provided its trade secrets, including source code, to Accenture over the course of several years. The evidence indicated that the trade secrets had been provided in connection with several project (including Trade Ranger, a Marathon project, and a Grand Basin project), as well as when Accenture conducted due diligence in consideration of a potential acquisition of Wellogix. (5/11/11 Tr. 476-78; 5/12/11 Tr. 921; 5/13/11 Tr. 1018; PX 473.) Wellogix also presented evidence that it had entered into six confidentiality agreements with Accenture over several years, including a teaming agreement and an agreement regarding the Marathon project. (5/10/11 Tr. 289, 297, 299; PX 890.) Epley testified that Wellogix had provided Accenture its trade secrets pursuant to a teaming agreement and the Marathon agreement, including its source code pursuant to a confidentiality agreement. (5/11/11 Tr. 477:8-14, 478:19-23.) Wellogix also presented evidence that Accenture had access to its trade secrets, including a document like PX 714, via the eTrans SharePoint site. (5/12/11 Tr. 805, 873-77; 5/13/11 Tr. 1022-27; PX 433; PX

494; PX 904; PX 1002.) This evidence provided a basis for the jury to infer that Accenture obtained Wellogix's trade secrets pursuant to a confidential relationship between the two companies and, by later using the trade secrets for unauthorized purposes, breached that confidential relationship.

Accenture argues that the evidence showed that Wellogix never provided its source code to Accenture and always maintained it behind a firewall. However, Epley's testimony on this point referenced the provision of source code during the eTrans project; Epley and Roman also testified that the source code had been provided directly to Accenture during other projects, such as the Trade Ranger and Marathon projects. (5/11/11 Tr. 513-14; 5/13/11 Tr. 1018-19.)

Accenture also attacks the jury's reliance on testimony by Epley and Roman that contradicts the testimony of Wellogix's corporate representative, Chisholm, that Wellogix never provided its source code to Accenture. (5/17/11 Tr. 1805.) Finally, Accenture points to its own fact witness testimony that Accenture employees never saw Wellogix's source code. Despite the testimony favoring Accenture's claims that it never had access to Wellogix's trade secrets, including its source code, the jury was entitled to weigh the credibility of the witnesses and draw the reasonable inference from the testimonial and documentary evidence that Accenture, in fact, did have access to Wellogix's source code. *See Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000) (jury's function is to weigh conflicting evidence and inferences and determine credibility, while court "must disregard all evidence favorable to the moving party that the jury is not required to believe") (quoting *Reeves*, 530 U.S. at 151). Thus, while Accenture presented evidence from interested witnesses that the jury could have believed, the jury was not unreasonable in crediting the testimony of Epley and Roman and accepting documentary evidence showing Accenture's access to the eTrans SharePoint site. We find that there was

sufficient evidence to support the jury's finding of improper acquisition of Wellogix's trade secrets.

### 3. Use of Trade Secret

Accenture argues that the jury did not have a legally sufficient evidentiary basis to conclude that Accenture had used Wellogix's trade secrets. "Use" of a trade secret means commercial use, by which a person seeks to profit from the use of the secret. *Atlantic Richfield Co. v. Misty Prods., Inc.*, 820 S.W.2d 414, 421 (Tex. App.—Houston [14th Dist.] 1991, writ denied). This definition of "use" was provided in the jury's instructions. (Doc. No. 298 at 8.) Accenture contends that the evidence presented at trial did not support Wellogix's contention that Accenture had used Wellogix's trade secrets in one or more of the following projects: BP's P2P Project, xIEP, and/or enhancement of SAP's SRM software.

First, with respect to BP's P2P Project, Wellogix presented evidence that Accenture was retained to assist BP with implementation of SAP's software platform in the P2P Project. Accenture played the role of a consultant, engaged in software implementation, while BP acted as the client. (5/12/11 Tr. 703; 5/16/11 Tr. 1369.) The distinct roles played by Accenture and BP during the P2P Project are crucial. Although the Arbitration Order found that BP had not used Wellogix's trade secrets in the P2P Project, this finding does not preclude Wellogix's allegations that *Accenture*, which carried out a different set of activities than BP in relation to the P2P Project, used Wellogix's trade secrets while working on the P2P Project.[3] (5/17/11 Tr. 1581-82.) Indeed, Wellogix presented evidence that Accenture had developed complex services templates for the P2P Project through the efforts of Accenture employees working apart from BP employees. (PX 894; PX 898; PX 923.) Although Accenture presented controverting evidence

---

[3] For example, although the testimony of Michelle Monteau, a BP employee, is relevant to whether BP misappropriated Wellogix's trade secrets, and could shed light on Accenture's role on the P2P Project, it cannot directly answer the question of what work Accenture performed on the P2P Project. (5/13/11 Tr. 1209.)

that its employees had not accessed Wellogix's intellectual property and had simply used standard SRM features to create shopping cart-type templates, the jury was entitled to weigh the evidence presented and find against Accenture on this element of trade secret misappropriation.[4] (5/16/11 Tr. 1262, 1340-42, 1351-53; 5/17/11 Tr. 1792, 1809.) Even though the P2P Project remained in its pilot phases, Accenture clearly sought to profit by using Wellogix's trade secrets to keep BP content with the P2P Project and retain its lucrative consulting work with BP. (PX 923 at ACN00002805.)

Second, with respect to the xIEP project, Wellogix presented evidence that Accenture and SAP were developing an application called xIEP for use by oil and gas companies. (5/11/11 Tr. 563-64.) Of the three scenarios included in xIEP, Wellogix was intended to be the developer for Scenario 3, which related to complex services. (*Id.* at 564.) In addition, Wellogix presented documentary evidence that Accenture intended to lift Wellogix's intellectual property from the Marathon project to SAP's development center in Walldorf, Germany for use in the xIEP project. (PX 473.) However, as both Roman and Smith testified, Scenario 3 was never developed, and xIEP did not contain any source code or confidential information from Wellogix. (5/13/11 Tr. 1053; 5/17/11 Tr. 1809.) Therefore, the "use" element of trade secret misappropriation cannot be shown through Accenture's development work on the xIEP project.[5]

Finally, with respect to enhancement of SAP's SRM software, Wellogix presented evidence that SAP's SRM software worked together with SAP's ECC software, which was

---

[4] Accenture's citation to *Plains Cotton Coop. Ass'n of Lubbock, Tex. v. Goodpasture Computer Serv., Inc.*, 807 F.2d 1256 (5th Cir. 1987), is inapposite. In *Plains Cotton*, the Fifth Circuit affirmed the district court's denial of a preliminary injunction for alleged trade secret misappropriation because the trade secret misappropriation was "nothing more than a restaging of the copyright battle," and the plaintiff had failed to show copying on any level of the computer software, including direct copying of source code. Here, Wellogix submitted evidence that Accenture copied not only the content of its complex service templates, but also the specific design and function of Wellogix's software.

[5] However, other elements of trade secret misappropriation and issues submitted to the jury, including malice, can be shown through Accenture's work on the xIEP project.

confirmed by Accenture's expert. (5/12/11 Tr. 933-34; 5/13/11 Tr. 1141-42; 5/18/11 Tr. 1932:15-18.) Wellogix presented evidence that SAP's ECC software contained certain matches to Wellogix's software in terms of functional identity. (5/12/11 Tr. 907-12, 1144; PX 831-36-1.) Contrary to Accenture's characterization, Roman did not testify only that the function copied from Wellogix's software was the use of red lights and green lights. (5/13/11 Tr. 1146.) Rather, Roman also testified that the function being copied from Wellogix's software was the manner in which the software could reconcile the line item detail of the purchase order or contract with the eField Ticket and invoice. (5/13/11 Tr. 1146:22-1147:3.) To controvert Wellogix's claims, Accenture presented evidence that it never modified the source code for SAP's software. (5/17/11 Tr. 1558.) Accenture also presented expert testimony, through Smith, that none of SAP's software, including SRM 4.0, SRM 5.0, SRM 7.0 ECC, or R/3, contained Wellogix's source code. (5/17/11 Tr. 1787-88, 1800, 1809.) The jury, presented with Wellogix's evidence and Accenture's controverting evidence, had a legally sufficient basis to conclude that Accenture used Wellogix's trade secrets in order to enhance SAP's software. Therefore, we must deny Accenture's motion for judgment as a matter of law on the element of "use" in Wellogix's trade secret misappropriation claim.[6]

### C.  Harm to Wellogix

In order to succeed on a claim of trade secret misappropriation, Wellogix was required to show that it was damaged as a result of Accenture's use of its trade secrets. *See Taco Cabana Int'l*, 932 F.2d at 1123. During trial, Wellogix introduced evidence of its value at the time of the misappropriation in late 2005, and that it had been eyed by companies such as SAP for acquisition or investment. (5/13/11 Tr. 1077; 5/10/11 Tr. 401-02; PX 878.) Wellogix also

---

[6] For the same reasons, we find that the jury had a legally sufficient evidentiary basis to find that Accenture had committed a theft of Wellogix's trade secrets by knowingly copying, communicating or transmitting Wellogix's trade secrets without Wellogix's effective consent. (Doc. 298 at 10.)

introduced testimony that the value of its company rested on its trade secrets. (5/12/11 Tr. 925-27.) Finally, Wellogix introduced evidence that, after Accenture's use of its trade secrets, the value of its intellectual property was severely diminished because companies no longer needed to go through Wellogix to obtain the functions that Wellogix's software provided. (5/12/11 Tr. 926-27.)

Accenture contends that it presented evidence of several other factors that contributed to Wellogix's failure as a start-up company. These included the preference of customers and oilfield service vendors to use existing methods of ordering complex services, the decision by Wellogix's customers to stop using Wellogix technology due to problems with the technology itself, problems with product development, competitor technology, and a general economic downturn.  Accenture also points to Wellogix's purported inability to present evidence that it lost prospective clients due to Accenture's actions. Finally, Accenture argues that Wellogix failed to rule out the possibility that its loss in value was due to SAP's access and potential misappropriation rather than Accenture's actions.

Under Texas law, "[t]he components of proximate cause are cause in fact and foreseeability. The test for cause in fact, or 'but for causation,' is whether the act or omission was a substantial factor in causing the injury 'without which the harm would not have occurred.' A finding of cause in fact may be based on either direct or circumstantial evidence, but cannot be supported by mere conjecture, guess, or speculation." *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727 (Tex. 2003) (internal citations omitted). Here, the jury was entitled to rely on Wellogix's expert and fact witness testimony, the valuation done in 2005, and the chronology of events to conclude that Accenture's actions, rather than SAP's actions, were a substantial factor in Wellogix's loss of value. Although the Court may not have reached the same conclusion

14

regarding proximate causation as the jury did, under the deferential standard applicable to the jury's findings and our obligation to draw all reasonable inferences in favor of Wellogix, we must conclude that the jury's finding was supported by legally sufficient evidence.

### D.  Proof of Wellogix's Compensatory Damages

At trial, Wellogix submitted evidence of its lost business value through the testimony of its experts Michael Wagner ("Wagner") and Kendyl Roman.  Wagner testified that Wellogix's value just prior to the alleged misappropriation by Accenture in late 2005 was $27,779,725. Wagner testified that his opinion regarding Wellogix's value in late 2005 was based primarily upon the transaction between First Capital investors and Wellogix in which First Capital, after conducting due diligence, decided to invest approximately $8.5 million in exchange for 31% of Wellogix's shares. (5/13/11 Tr. 1090:1-4, 1102:13-18, 1135; PX 1013.) Wagner testified that this type of transaction, performed close in time to the alleged misappropriation and based on independent review of Wellogix's financial performance and projections, was a good basis for a calculation of Wellogix's value in late 2005. (5/13/11 Tr. 1078-79, 1090.) Wagner also testified about his review of a valuation of the company performed by Innovation Advisors in May 2005 that placed the value of Wellogix's equity at $17.2 to $17.9 million. (5/13/11 Tr. 1079-81; PX 878.) In addition to Wagner's testimony, Wellogix presented Roman, who testified that the value of Wellogix dropped to zero after the misappropriation. (5/12/11 Tr. 926.)

Under Texas law, "the proper measure of damages for destruction of a business is measured by the difference between the value of the business before and after the injury or destruction." *Sawyer v. Fitts*, 630 S.W.2d 872, 874-75 (Tex. App.—Fort Worth 1982, no writ). Lost business value is an appropriate measure of damages when business value is completely or almost completely destroyed. *C. A. May Marine Supply Co. v. Brunswick Corp.*, 649 F.2d 1049,

1053 (5th Cir. 1981). If future profits are included within the calculation of lost business value, it is impermissible to obtain damages awards for both lost business value and lost future profits. *Id.*

Accenture argues that Wagner's testimony was insufficient to support a theory of compensatory damages based on lost profits.[7] The crux of Accenture's challenge to Wellogix's compensatory damages award is misplaced. Wellogix did not seek lost profits as its measure of damages, but rather sought lost business value. There was sufficient evidence in the record, through Roman's testimony, that Wellogix lost all of its value as a software company once its trade secrets were misappropriated. The jury was entitled to accept Roman's testimony and reject Accenture's evidence that Wellogix might still have some value based upon its patents. Once Wellogix provided sufficient evidence that it had lost all or almost all of its value, it was entitled to a damages award based upon lost business value.

The cases cited by Accenture address damages awards that are based exclusively on future lost profits and do not encompass lost business value as a measure of damages. *See, e.g.*, *Small Bus. Assistance Corp. v. Clear Channel Broad., Inc.*, 210 F.3d 278, 281 (5th Cir. 2000); *Information Commc'n Corp. v. Unisys Corp.*, 181 F.3d 629, 633 (5th Cir. 1999); *Texas Instruments v. Teletron Energy Mgmt.*, 877 S.W.2d 276, 278-79 (Tex. 1994). Here, future profits were part of the valuations performed by First Capital and Innovation Advisors, which, in turn,

---

[7] Wellogix challenges the propriety of Accenture's inclusion of this argument in its renewed motion for judgment as a matter of law. Wellogix contends that Accenture never mentioned the alleged insufficiency of evidence supporting compensatory damages during either of the prior times it moved for judgment as a matter of law. Although a party who fails to present a Rule 50(a) motion on an issue at the close of evidence waives both its right to present a Rule 50(b) motion after judgment and its right to challenge the sufficiency of the evidence on appeal, "Rule 50(b) is construed liberally, and we may excuse 'technical noncompliance' when the purposes of the rule are satisfied." *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 288 (5th Cir. 2007). Here, Accenture moved for judgment as a matter of law at the close of all the evidence and clearly stated that it did not believe that there was a legally sufficient evidentiary basis for Wellogix's "damages, or, as you just heard, with respect to exemplary damages." (5/18/11 Tr. 2097.) Wellogix did not object to the Court's preserving of all of Accenture's arguments for the motion. (*Id.*) Therefore, we find that Accenture sufficiently preserved its right to make a Rule 50(b) motion on the issue of compensatory damages.

served as part of the basis for Wagner's expert opinion on Wellogix's value in late 2005.[8] However, Wagner testified that the best and primary evidence supporting his opinion was First Capital's $8.5 million investment in Wellogix in exchange for 31% of the company. This investment, and Wagner's reliance upon it, is neither speculative nor uncertain. *See Fluorine on Call Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 860 (5th Cir. 2004) (lost value measure of damages is based upon market value of asset prior to wrongful conduct, which, in turn, "is determined by considering what a hypothetical buyer would pay for the chance to earn future profits. And the best evidence of this value is an actual sale of the asset."). Thus, we conclude that sufficient concrete evidence supported the jury's award of compensatory damages based on lost business value.

### E.  Proof of Accenture's Malice

In order to support an award of exemplary damages, Wellogix was required to prove, by clear and convincing evidence, that Accenture acted with malice when it misappropriated Wellogix's trade secrets. *See* Tex. Civ. Prac. & Rem. Code § 41.003(a)(2) (2011). "Malice" is defined as "a specific intent by the defendant to cause substantial injury or harm to the claimant." *Id.* § 41.001(7).

At trial, Wellogix presented evidence that supported the jury's finding that Accenture not only intended to misappropriate Wellogix's trade secrets, but also intended to cause Wellogix substantial harm. With respect to misappropriation, the jury heard testimony and saw documentary evidence showing that Accenture had access to and used Wellogix's trade secrets on the eTrans SharePoint site. (5/12/11 Tr. 873, 879-85; PX 433; PX 469; PX 494, PX 902; PX 904; PX 923.)

---

[8] Wagner, however, testified that he did not use the same calculations as Innovation Advisors or the valuations of First Capital. (5/13/11 Tr. 1081:11-16.)

In addition to the evidence regarding Accenture's intent to misappropriate Wellogix's trade secrets, the jury heard evidence indicating that Accenture intended to cause substantial injury to Wellogix's business. The jury saw emails in which Accenture employees, when faced with the alternatives of developing SAP SRM's complex services functionality with Wellogix or without Wellogix, expressed a "preference" for helping SAP build this functionality without Wellogix. (PX 496; PX 473.) The jury also heard testimony regarding Accenture's fear that, if SAP bought Wellogix and integrated Wellogix's functionality directly into its software, Accenture would be at risk of losing lucrative consulting assignments at oil and gas companies where it served as an implementer of Wellogix's software. (5/18/11 Tr. 2086-87; PX 972; *see also* 5/11/11 Tr. 574.) Accenture did present controverting evidence indicating that it did not develop software itself and looked for ways to partner with Wellogix. (5/16/11 Tr. 1485; 5/11/11 Tr. 574-75.) However, the jury was entitled to weigh the evidence, determine the credibility of the various witnesses, and decide that Accenture, in fact, not only intended to steal Wellogix's trade secrets, but also intended to cut Wellogix out of the business deals with BP and SAP in order to preserve the need of oil and gas companies for Accenture's consulting services. The jury was also entitled to conclude that Accenture's cautions to Wellogix about SAP's "bleed the knowledge" tactics were a way for Accenture to prevent Wellogix from working "around" Accenture and to prevent SAP from acquiring control over Wellogix's functionality and eliminating the need for Accenture's implementation services. (5/10/11 Tr. 390-91; 5/11/11 Tr. 580-82; PX 985.)

In sum, the evidence was sufficient to demonstrate that Accenture acted with malice.

**F.  Exemplary Damages**

Based on our finding regarding the sufficiency of evidence regarding Accenture's malice, we find that there was sufficient evidence to support the jury's award of exemplary damages. Accenture's Motion for Judgment as a Matter of law also incorporates its argument, urged in its Motion for New Trial or Remittitur, that the amount of exemplary damages awarded in this case is unconstitutionally excessive. The Court considers that argument in its discussion of Accenture's Motion for New Trial or Remittitur, below.

In sum, we find that, based on the standard requiring us to provide generous deference to jury findings, the jury verdict was based on legally sufficient evidence. Considering the evidence, "in the light and with all reasonable inferences most favorable" to Wellogix, we must conclude that the "facts and inferences" do not "point so strongly and overwhelmingly in favor of" Accenture that reasonable persons could not have arrived at a verdict in favor of Wellogix. *See Taco Cabana Int'l, Inc.*, 932 F.2d at 1124 (citing *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (en banc)). As such, Accenture's Rule 50(b) renewed motion for judgment as a matter of law is denied.

## III.   MOTION FOR NEW TRIAL OR REMITTITUR

Also pursuant to Rule 50(b), Accenture moves for a new trial or, in the alternative, a remittitur of the exemplary damages awarded by the jury. Accenture makes the following arguments: (1) the Due Process Clause requires the elimination or substantial reduction of the exemplary damages award; (2) the Court should also, or alternatively, exercise its discretion to suggest a substantial remittitur of the exemplary damages award; (3) the jury's findings are against the great weight of the evidence; (4) the admission of Wellogix's patent evidence requires a new trial; and (5) the admission of Roman's testimony warrants a new trial.

### A.  Legal Standard

Federal Rule of Civil Procedure 59 states that a court may, on motion, grant a new trial after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). A court therefore may grant a new trial if it finds that the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course. *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).

Courts are to decide whether to grant a new trial based on their assessment of the fairness of the trial and the reliability of the jury's verdict. *Seidman v. Am. Airlines, Inc.*, 923 F.2d 1134, 1140 (5th Cir. 1991). This decision lies within the discretion of the court. *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir. 1982). In determining whether to grant a motion for new trial, the court must view the evidence in the light most favorable to the jury's verdict, and the verdict must be affirmed unless the evidence points so strongly and overwhelmingly in favor of the other party that the Court believes that reasonable persons could not arrive at a contrary conclusion. *Dawson v. Wal–Mart Stores, Inc.*, 978 F.2d 205, 208 (5th Cir. 1992). When a party moves for a new trial on evidentiary grounds, a new trial should not be granted unless "the verdict is against the great weight of the evidence." *Pryor v. Trane Co.*, 138 F.3d 1024, 1026 (5th Cir. 1998). A decision on remittitur, like a determination on whether to grant a new trial, is within the sound discretion of the trial court. *See Thompson v. Connick*, 553 F.3d 836, 865 (5th Cir. 2008).

### B.  Constitutionality of Exemplary Damages

Accenture moves for a new trial or, in the alternative, a remittitur, on the basis that the damage award in this case violates the Due Process Clause. Ultimately, "[o]nly when an award can fairly be categorized as 'grossly excessive' does it enter the zone of arbitrariness that violates

the Due Process Clause." *BMW of N. Am. v. Gore*, 517 U.S. 559, 568 (1996). In *Gore*, the Supreme Court provides three factors that courts are to consider when determining the constitutionality of a punitive damages award. They are "the defendant's reprehensibility or culpability; the relationship between the penalty and the harm to the victim caused by the defendant's actions; and the sanctions imposed in other cases for comparable misconduct." *Id.* (citing *Cooper Indust., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424 (2001)). Of these three factors, the "most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) (quoting *Gore*, 517 U.S. at 575).

### 1. Reprehensibility or Culpability

The Supreme Court has provided five factors for courts to consider in analyzing a defendant's reprehensibility, but notes that "[t]he existence of any one of these factors…may not be sufficient to sustain a punitive damages award[,] and the absence of all of them renders any award suspect." *Id.* These factors are: (1) whether the harm caused was physical or economic; (2) whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) the financial vulnerability of the target of the conduct; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit as opposed to mere accident. *Id.* While the first two factors weigh against Wellogix—the harm was not physical nor was health or safety an issue in this case[9]—the third and fifth factors weigh in Wellogix's favor. The fourth factor does not clearly favor either party.

---

[9] As clarified by the Supreme Court, the absence of a physical injury itself does not render an award of exemplary damages unconstitutional. In *Gore*, the Supreme Court held that "infliction of economic injury, especially when done intentionally through affirmative acts of misconduct ... can warrant a substantial penalty." 517 U.S. at 576.

As to financial vulnerability, Accenture argues that Wellogix was a "sophisticated software company" sharing few similarities with the financially vulnerable plaintiffs in *State Farm* (an elderly couple whose insurer refused to settle within policy limits). 538 U.S. at 413. However, the Supreme Court's "financial vulnerability" prong is not limited to individual, highly sympathetic plaintiffs like those in *State Farm*; rather, the financial vulnerability of a plaintiff may be looked at in context. *See, e.g.*, *Saunders v. Branch Banking and Trust Co. of Virginia*, 526 F.3d 142, 153 (4th Cir. 2008) (considering the fact that the plaintiff had limited resources as compared to the defendant, and that the defendant's conduct rendered the plaintiff more financially vulnerable). Wellogix was a start-up at the time of the Accenture's conduct; it was a relatively young company with an uncertain financial future. Wellogix's complete loss in value demonstrates just how vulnerable it was. Especially when considered in comparison to Accenture, we conclude that Wellogix was a financially vulnerable target.

As to whether the conduct involved repeated actions or was an isolated incident, Wellogix presented evidence that Accenture's ongoing efforts to steal its trade secrets caused the company's ultimate collapse. However, Accenture points out that "repeated conduct," as it is meant by the Supreme Court in *Gore*, refers to "recidivism." 517 U.S. at 577; *see also Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 309 n. 48 (Tex. 2006). While Wellogix has not presented an argument that the conduct in this case was recidivist, it was clearly not an "individual instance of malfeasance," *Gore*, 517 U.S. at 577, as it involved ongoing conduct by Accenture, rather than one isolated act. We therefore conclude that, while this factor does not weigh in Wellogix's favor, it does not weigh in favor of finding the punitive damages award unconstitutional.

Finally, as to whether the harm was a result of intentional malice, trickery, or deceit, the Court determines, as discussed above, that Wellogix presented sufficient evidence to support such a conclusion. Wellogix presented evidence that Accenture not only intended to misappropriate Wellogix's trade secrets, but that it also intended to cause Wellogix substantial harm. Further, there was evidence that Accenture intended to steal Wellogix's trade secrets and to cut Wellogix out of the business deals with BP and SAP. Ultimately, the Court finds that there is sufficient evidence that Accenture engaged in reprehensible conduct.

## 2.   Relationship Between Penalty and Harm to the Victim

With respect to the second factor, the Supreme Court has "rejected the notion that the constitutional line is marked by a simple mathematical formula." *Gore*, 517 U.S. at 582. (citation omitted). While "exemplary damages must bear a reasonable relationship to compensatory damages," *id.* at 580 (internal quotation marks and citation omitted), "[t]here is no particular disparity between punitive and actual damages that will automatically result in [the court's] declaring a punitive damages award unconstitutional," *Watson v. Johnson Mobile Homes*, 284 F.3d 568, 573 (5th Cir. 2002). Higher ratios of punitive to compensatory damages may "be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Gore*, 517 U.S. at 582. There exists no "mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable." *Id.* at 583 (citations and internal quotations omitted).

The ratio of exemplary damages to compensatory damages in this case is approximately 2.6:1. Though the Supreme Court has not articulated a bright line ratio which exemplary damages awards cannot exceed, it has held that "single-digit multipliers are more likely to comport with due process." *State Farm*, 538 U.S. at 425. The Supreme Court also held that

23

"[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." 538 U.S. at 425. While the Court agrees with Accenture that the compensatory damages in this case are substantial, it does not find that the relationship between exemplary damages and compensatory damages exceeds constitutional bounds.

### 3.  Sanctions Imposed in Other Cases

Neither party asks the Court to consider sanctions imposed in other cases, and the Court finds that the facts of this case—Accenture's conduct, the nature of the relationship between Wellogix and Accenture, and the extent of the harm to Wellogix—render the case unique and minimize the relevance of sanctions imposed in other cases.

Ultimately, the Court concludes that the exemplary damages in this case are not *grossly excessive*, and are therefore not unconstitutional.

### C.  Discretionary Reduction of Exemplary Damages

Beyond the reasons which Accenture argues justify a constitutional reduction of exemplary damages in this case, Accenture also asks the Court to reduce the exemplary damages because of the extent to which exemplary damages exceed the amount requested by Wellogix's own counsel. In Texas, the standard of review for an excessive damages complaint is the factual sufficiency of the evidence. *Forte v. Wal-Mart Stores, Inc.*, 2011 WL 1740182, at *3 (S.D. Tex. May 4, 2011). The standard is highly deferential, and damages are set aside "only upon a clear showing of excessiveness." *Duff v. Werner Enters., Inc.*, 489 F.3d 727, 730 (5th Cir. 2007). An excessive award exceeds the "maximum amount calculable from the evidence." *Carlton v. H.C. Price Co.*, 640 F.2d 573, 579 (5th Cir. 1981) (citation omitted). After reviewing all of the evidence, courts are permitted to vacate or remit a damage award if it appears to be "so factually

24

against the great weight and preponderance of the evidence as to be manifestly unjust." *Forte*, 2011 WL 1740182, at *3 (citation and quotation omitted).

Wellogix requested $18.2 million in exemplary damages in this case; the jury ultimately awarded $68.2 million—$50 million more than Wellogix requested. The Court therefore agrees with Accenture that the punitive damages award in this case is factually against the great weight of the evidence; the amount so exceeds what was requested by Wellogix's counsel that it appears contrary to right reason. *See Brunnemann v. Terra Int'l, Inc.*, 975 F.2d 175, 178 (5th Cir. 1992) ("Damage awards which are merely excessive or so large as to appear contrary to right reason…are subject to remittitur.") (citing *Wells v. Dallas Indep. Sch. Dist.*, 793 F.2d 679, 683-84 (5th Cir. 1986)). The Court concludes that the maximum amount of punitive damages supported by the evidence in this case is $18.2 million dollars. We therefore grant Accenture's Motion for New Trial or Remittitur, and order Wellogix to choose whether to accept a $50 million remittitur or hold a new trial.

### D.  Jury's Findings Against the Great Weight of the Evidence

Accenture moves for a new trial based on its argument that the jury's findings are against the great weight of the evidence. As discussed in Part II, above, Wellogix presented sufficient evidence to support the jury's findings and avoid judgment as a matter of law. Even in the context of a motion for a new trial, where we do not weigh the evidence in the light most favorable to Wellogix, we still find that Wellogix presented sufficient evidence of all of its claims to sustain the jury's verdict. At trial, both Wellogix and Accenture presented numerous documents and testimony to substantiate their account of the business relationship between Wellogix, Accenture, BP, and SAP, and Accenture's misappropriation of Wellogix's trade secrets. In addition, Wellogix and Accenture both presented varying accounts of Accenture's

malice towards Wellogix and evidence to support their respective position. Viewing the evidence presented during trial, we cannot reach the conclusion that the jury's verdict was against the great weight of the evidence. As such, we deny the motion for a new trial on this ground.

### E.  Admission of Patent Evidence

Accenture contends that admission of evidence regarding Wellogix's patents was prejudicial error that entitles Accenture to a new trial. According to Accenture, Wellogix used evidence that it had patented its software to confuse the jury into believing that it possessed trade secrets. Accenture argues that the jury confusion caused by admission of the patent evidence prejudiced Accenture.

We begin from the undisputed fact that the jury was given a legally correct instruction, "The existence of a patent does not mean that a trade secret exists" (Doc. No. 198 at 6), and from the legal presumption that a jury follows its instructions.[10] *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000). This jury instruction was reinforced by the Court's own statements to the jury that a patent and a trade secret cannot coexist because a patent is a public statement, while a trade secret remains secret. (5/10/11 Tr. 214-15.) In light of the Court's statements to the jury, we cannot accept Accenture's contention that the jury disregarded the jury instructions and instead somehow believed that Wellogix's patents meant that a trade secret existed.

The jury's reliance on Wellogix's May 16, 2006 demand letter regarding potential patent infringement was not inappropriate and does not necessarily indicate that the jury erroneously understood Wellogix's patents to confer trade secret status. Rather, Wellogix's counsel argued to the jury that the May 16, 2006 letter should be interpreted as an indicator of the date by which Wellogix was aware of Accenture's wrongful conduct with respect to Wellogix's intellectual

---

[10] For the reasons explained in Part II, above, Wellogix's gloss on the jury instruction, "it says, the existence of a patent does not mean that a trade secret exists. It certainly doesn't mean it doesn't either," was not an incorrect statement of the law. (5/19/11 Tr. 2139.)

property. (5/19/11 Tr. 2142-43; 5/11/11 Tr. 470; PX 847.) Similarly, Wellogix's references to its patents and patent applications were framed by Wellogix's counsel not as a sign that Wellogix had trade secrets, but rather as an indicator that Wellogix possessed valuable intellectual property. (5/10/11 Tr. 238; 5/11/11 Tr. 475-76.) Finally, Wellogix's use of emails exchanged between Accenture and BP employees regarding Wellogix's claims of patent infringement could be interpreted by the jury as a recognition and acknowledgment by the employees of the wrongful nature of the conduct vis-à-vis Wellogix's intellectual property. (PX 501; PX 502; PX 818; PX 1005.) Accenture attempted to rebut this reading of the emails by suggesting that the discussion among Accenture and BP employees was an entirely appropriate reaction to threatened litigation, rather than acknowledgement of guilty conduct. (5/11/11 Tr. 484-87.) From these emails, the jury was entitled to draw the inference that Accenture and BP had engaged in misappropriation of trade secrets. The jury was not entitled to draw the conclusion that Wellogix's patents indicated that it possessed trade secrets, and there is no suggestion that they did so.

Ultimately, the instructions provided to the jury were substantively correct and we are not convinced that Wellogix's presentation of evidence that referenced its patents had the effect of convincing the jury otherwise. Therefore, we deny Accenture's motion for a new trial on this ground.

### F.  Admission of Roman's Testimony

Accenture also moves for a new trial based on the admission of Roman's testimony, which, according to Accenture, constituted prejudicial error. Specifically, Accenture contends that Roman's testimony should have been excluded because he was unqualified to testify, his

testimony was unreliable and likely confused the jury, and he presented fact witness testimony despite his lack of personal knowledge.

Regarding Roman's qualifications, the Court previously addressed and rejected a motion to exclude Roman's expert opinions on this basis. (Doc. No. 237.) At trial, Roman did not exceed the bounds of his area of expertise, which included computer software programming, software design and implementation, testing, and source code comparison and analysis. (5/12/11 Tr. 784-92, 904-06.) Although the software at issue in this case was implemented within the oil and gas industry, Roman did not need to possess oil and gas industry-specific knowledge in order to provide testimony that assisted the jury in understanding the complex, software-related terminology and determining many elements of Wellogix's trade secret misappropriation claim. *See* Fed. R. Evid. 702. For example, Roman reviewed an Accenture document that assessed various software vendors' capabilities, and he described how Wellogix's solution was identified in the Accenture document as a unique solution. (5/12/11 Tr. 797-98; 5/13/11 Tr. 1000-03.) As for Roman's lack of prior experience implementing SAP software and working with SAP's programming language, ABAP, Roman testified that he had been able to teach himself the language and implement the SAP software within his own company. (5/13/11 Tr. 994, 1138-40.) For the purpose of his expert opinion, which was to compare Wellogix's source code with SAP's source code, we believe that this experience, combined with Roman's extensive experience with many types of programming languages, software implementation, and code comparison analysis, was sufficient to qualify him to render the opinion.

Regarding Roman's alleged fact testimony given without personal knowledge, the Court finds that Roman's testimony stayed on the right side of the line between expert and fact witness testimony. For example, when testifying about Plaintiff's exhibit 894, Roman identified the

contributors to the document based on his review of hundreds of documents and many depositions, described how to read the spreadsheet in an intelligible manner, and provided the jury with his understanding, gathered from his industry expertise, of the term "functionality." (5/12/11 Tr. 810-16.) Roman did not testify as to what the contributors to the document meant when they used the word "functionality," but rather how the term is generally used in the industry. Similarly, Roman testified as to the manner in which certain documents were stored and sent among key personnel—information that he obtained from the documents themselves and relevant deposition testimony. (5/13/11 Tr. 874-77.)  Finally, Roman testified regarding the relationships among the key players in the case, including Accenture and SAP, based on his general knowledge of how consultant and software companies work together. (5/12/11 Tr. 913-15.) This testimony provided helpful context for the jury to understand the various relationships among the key entities in the case.

The most serious challenge to Roman's testimony is his comparison of Wellogix's source code to SAP's source code in its SRM and ECC software programs. It is clear that Roman compared Wellogix's source code to both SRM and ECC. (5/13/11 Tr. 903.) Testimony from both Roman and Accenture's expert, Smith, demonstrated that SRM and ECC, although they are separate software products, work together as part of SAP's overall business suite software package. (5/13/11 Tr. 1141-42; 5/18/11 Tr. 1932:15-18.) Smith confirmed that ECC was used by the oil and gas industry in addition to German municipal governments and other organizations. (5/18/11 Tr. 1930.) Roman identified code in ECC that was functionally similar to Wellogix's source code, but did not identify any code in SRM that was similar to Wellogix's source code. (5/13/11 Tr. 912.) However, Roman's identification of functionally similar code in ECC, rather than in SRM, does not render his methods in conducting source code comparison and analysis

unreliable.[11] Smith's controverting testimony that Roman's matches were not actually matches and that the matches came from source code only used by German municipal governments was appropriately considered by the jury in terms of the weight to assign to each expert's testimony. (5/17/11 Tr. 1800-01.) Further, given both experts' testimony regarding the interaction between ECC and SRM, Roman's conclusion that SAP had incorporated Wellogix's source code into its key components is not unreliable.

Overall, both Wellogix and Accenture had an opportunity to present testimony from experts whose qualifications and methodology met the standards required by the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The various challenges that Accenture raises to Roman's expert testimony were issues appropriately presented to the jury, and were relevant to the weight assigned to Roman's testimony, not to its admissibility. We do not find the admission of Roman's testimony to be prejudicial error and deny Accenture's motion for a new trial on this ground.

### G.  Other Evidentiary Issues

Accenture also raises two additional issues that it contends merit a new trial. First, Accenture argues that the Court erroneously admitted evidence related to Accenture's work for BP, when it should have given preclusive effect to the arbitral finding that no trade secrets were used in BP's P2P project. Our discussion in Part II, above, outlines why admission of Accenture's role in BP P2P's project was appropriate and not precluded by the arbitral findings. Therefore, this ground does not suffice as a basis for a new trial.

---

[11] Accenture cites to certain testimony by Roman to emphasize the point that Roman's analysis does not show any misappropriation of Wellogix's source code in the SRM source code. (5/13/11 Tr. 1152:7-14.) However, the question posed to Roman was among a series of questions intended to highlight Accenture's argument that Accenture itself could have had nothing to do with alleged misappropriation, since Wellogix had shared its intellectual property with SAP directly. (5/13/11 Tr. 1152-53.) Thus, the testimony cited by Accenture does not demonstrate that Roman agreed with the proposition that his analysis of ECC source code is irrelevant to the SRM source code.

Second, Accenture contends that the Court admitted several BP documents over Accenture's objection that they contained inadmissible hearsay. First, it appears that Wellogix withdrew several of the BP emails, while others were referenced only for a limited purpose that did not involve the truth of the matter asserted within the document. (5/10/11 Tr. 201-08.) Second, with respect to other BP documents, the documents were not offered for the truth of the matter asserted but rather reflected the oil and gas industry's general perception of Wellogix's software offerings. (5/10/11 Tr. 374-75; 5/19/11 Tr. 2130-31.) The Court does not find the admission of these documents to be a sufficient basis to order a new trial.

## IV. CONCLUSION

Accenture's Rule 50(b) Renewed Motion for Judgment as a Matter of Law (Doc. 311) is **DENIED**. Accenture's Motion for New Trial or Remittitur (Doc. No. 312) is **GRANTED IN PART AND DENIED IN PART**. Wellogix is ordered to elect between consenting to remittitur and holding a new trial.

**IT IS SO ORDERED**.

**SIGNED** this the 14th day of October, 2011.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE